**STATE of Utah, Plaintiff and Respondent,**

v.

**Rosendo C. ROCHA, Defendant and Appellant.**

**No. 15869.**

Supreme Court of Utah.

Sept. 6, 1979.

1. *Naisbitt v. Hodges,* 6 Utah 2d 116, 307 P.2d 620.

2. *Child v. Child,* 8 Utah 2d 261, 332 P.2d 981.

Robert Van Sciver, Edward K. Brass, Salt Lake City, for defendant and appellant.

Robert B. Hansen, Atty. Gen., William W. Barrett, Asst. Atty. Gen., Theodore L. Cannon, Salt Lake County Atty., Salt Lake City, for plaintiff and respondent.

HALL, Justice:

Defendant appeals his bench trial conviction of possession of heroin with intent to distribute it for value.[1]

The record supports the following abstract of facts: Detective Sergeant Michael Hanks of the Salt Lake County Sheriff's Office, a specialist in narcotics enforcement, received information from three separate informers that heroin was being sold by two "Mexicans" on Lincoln Street in Salt Lake City. The first informant indicated that he had purchased heroin and that two Mexican people were "dealing out of a house" on Lincoln Street close to Thirteenth South Street. The second informer also indicated that he had purchased heroin at the Lincoln Street location and stated that the two Mexicans:

> . . . bring heroin in the morning and they deal heroin during the day and then they leave at approximately 5:00 in the afternoon, 5:30 and that they don't live at that address.

The third informant pointed out the house in question located at 1361 Lincoln Street, advised that he had purchased heroin there previously, and that there were two Mexicans who sold to buyers entering through the back door.

All three informants had supplied similar information in the past regarding criminal activities which had always proven to be accurate.

Beginning on November 13, 1977, surveillance of the house was initiated and the rear entrance was observed for several days from a trailer parked nearby. Both known and suspected heroin users were seen entering and leaving the house after brief intervals of time. Each day, a 1969 Ford automobile, registered to defendant, was observed parked at the house. On the day preceding the arrest, said Ford automobile arrived at 8:30 a. m. with two male Mexican occupants, one being the defendant. They went inside and thereafter, over a four hour period, a number of known or suspected heroin users were observed to enter and leave the house through the back door. On the following morning, the defendant and one Lopez arrived in the Ford automobile. Lopez entered the house through the back door while defendant parked the car. After parking the car but before he was able to enter the house, defendant was arrested by Sergeant Hanks. As the arrest was in progress, a brown substance was observed in defendant's pocket which proved to be 65 grams of 3.1 percent heroin (the equivalent of 260 "doses" in this area). Also as the arrest was in progress, Lopez came out of the house and when advised as to the identity of the law enforcement officers, he ran back inside. Deputy Sheriff Randel Anderson followed and arrested Lopez inside the back door. The deputy testified that Lopez appeared to be headed for a nearby cupboard where a loaded revolver was located. There was also a weapon in plain view behind the refrigerator. Lopez was then handcuffed and required to accompany the deputy throughout the house to look for further weapons or persons who might have been in the house. In one of the bedrooms, in plain sight, Deputy Anderson observed drug-associated paraphernalia consisting of alcohol, cotton balls, syringes, a tie-off, straight-edge, lighter, and spoons.

After receiving a *Miranda* warning, defendant stated that Lopez was not involved in the "business" or "operation" and that it was all his (defendant's). He also stated that he had rented the house, stayed there during the day, but slept elsewhere.

The trial court determined that the arrest, search of defendant's person incident thereto, and the search of the house was proper.

Defendant's appeal asserts only two points of error: (1) that the arrest was

---

1. In violation of U.C.A., 1953, 58–37–8(1)(a)(ii).

without probable cause, hence the heroin found on his person was inadmissible at trial, and (2) that the evidence taken from the house was the fruit of an unlawful search and, hence, also inadmissible at trial.

Our statute [2] provides that when an officer has reasonable cause to believe that a person has committed a public offense, although not in his presence, he may arrest that person if there is reasonable cause to believe that such person might destroy or conceal evidence before a warrant could be obtained.

"Reasonable cause" was defined in *State v. Hatcher,*[3] as follows:

. . . The determination should be made on an objective standard: whether from the facts known to the officer, and the inferences which fairly might be drawn therefrom, a reasonable and prudent person in his position would be justified in believing that the suspect had committed the offense. [Citations omitted.]

This Court additionally noted the following in *State v. Eastmond:*[4]

In performing his duties as authorized by this statute [77–13–3] a police officer is not required to meet any such standard of perfection as to demand an absolutely certain judgment before he may act. The test to be applied is one which is reasonable and practical under the circumstances: whether a reasonable and prudent man in his position would be justified in believing facts which would warrant making the arrest. *In ruling on the admissibility of evidence so obtained, the questions as to the validity of the arrest and the justification for any search made in connection therewith are primarily for the trial court to determine; and on appeal we respect that prerogative and do not upset his determination unless*

*it clearly appears that he was in error.* [Emphasis added, citations omitted.]

This standard is in accord with that previously declared by the United States Supreme Court for warrantless arrests in *Wong Sun v. United States.*[5]

In the instant case, the information possessed by Sergeant Hanks at the time of arrest was sufficient to warrant his belief that defendant had committed the crime charged. The independent, corroborating information received from informants known to have been reliable in the past was duly verified by an extended surveillance. The trial court properly ruled that the requisite standards for probable cause existed to make the arrest.

As to the warrantless search of the house, none was required since the search was reasonable and the drug paraphernalia seized was observed in plain view.[6]

The Constitution only prohibits searches that are unreasonable, and the unreasonableness of the search is to be determined from the attendant circumstances. A search incident to a lawful arrest is permissible when reasonable and necessary to protect the arresting officer and to prevent the destruction of evidence.[7]

Lopez concedes that the initial search which disclosed the loaded revolver and the other firearm was lawful. He only challenges the legality of the walk-through search of the house wherein the drug paraphernalia was observed in plain sight on a table and on shelves in an open closet.

It was necessary for the deputy to chase Lopez into the house in order to apprehend him at which time it appeared that he was attempting to obtain the loaded revolver. In light of that fact, and in the further interest of his personal safety and the safe-

---

2. U.C.A., 1953, 77–13–3; see also, *State v. Austin,* Utah, 584 P.2d 853 (1978) and the cases cited therein.

3. 27 Utah 2d 318, 495 P.2d 1259 (1972).

4. 28 Utah 2d 129, 499 P.2d 276 (1972).

5. 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

6. See *State v. Austin,* supra, footnote 2.

7. Ibid. See also, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

ty of others,[8] it was most reasonable for the deputy to assure himself that there were no additional persons on the premises with access to firearms. It was also reasonable for him to be apprehensive of the destruction of evidence by such persons before a search warrant could be obtained. Hence, the walk-through search was wholly reasonable and proper.

The defendant was afforded a fair trial and was convicted on evidence properly received.

The judgment of conviction is affirmed.

CROCKETT, C. J., WILKINS, J., and BALLIF, District Judge, concur.

STEWART, Justice (dissenting in part):

I respectfully dissent from that portion of the Court's opinion which holds that the warrantless search of the entire house in question was constitutionally legitimate.

Appellant was arrested outside his house. His associate was arrested in a room just inside a door. Without a warrant and with no other legal justification, the officer proceeded from that room to other rooms in the house where seizures were made. The Court's opinion seeks to justify that search and the seizures made without a warrant on the ground that "none was needed for the reason that all the evidence obtained was in plain view." However, that statement is accurate only if a police officer may proceed from the room of an arrest and continue on through all the rooms of a house without a search warrant and seize whatever he finds in those rooms. The law does not support such a proposition.

The Supreme Court of the United States in *Chimel v. California*, 395 U.S. 752, 764, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1965), responded to a contention that it is reasonable to search a man's house when he is arrested in it by stating:

But that argument is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests.

Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point. It is not easy to explain why, for instance, it is less subjectively "reasonable" to search a man's house when he is arrested on his front lawn—or just down the street—than it is when he happens to be in the house at the time of arrest.

In my view the holding in *Chimel v. California, id.*, should be dispositive of the issue of unlawful seizure of items seized in portions of the house other than where the appellant's associate was arrested. The Court in *Chimel* in language applicable here, stated 395 U.S. at 768, 89 S.Ct. at 2043:

Application of sound Fourth Amendment principles to the facts of this case produces a clear result. The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. The scope of the search was, therefore, "unreasonable" under the Fourth and Fourteenth Amendments, and the petitioner's conviction cannot stand.

The majority opinion also bases its holding on the ground that "a search incident to a lawful arrest is permissible when reasonable and necessary to protect the arresting officer and to prevent the destruction of evidence." However, the facts of this case show that the search was neither reasonable nor necessary to protect the arresting officer nor to prevent the destruction of evidence.

At least one of the informants told the police that two "Mexicans" were bringing the heroin to the house in the morning, that they sold heroin during the day, and that they left at approximately five o'clock in the afternoon. The informants said that the two men did not live at that address.

8. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

One of the arresting officers testified that surveillance of the house was conducted over a period of several days. He personally watched the house on November 13, 14, 16, 17 and 18, the 18th being the day of the arrest. At first the surveillance occurred over a period of a few hours; then on November 16 an arresting officer conducted the surveillance from about eleven o'clock in the morning until shortly after four o'clock that afternoon. He returned to the house that night at approximately eleven o'clock and he saw that the house was completely dark and that it had no vehicles in front of it. He went up to the front door and knocked, getting no answer. He walked around the house and knocked on the back door, also getting no answer. On November 17, surveillance was started at eight o'clock in the morning. The same officer testified that at 8:30 the defendant and another "Mexican" drove up in the 1969 Ford, with the defendant driving. The passenger got out of the vehicle, went to the back door and into the house. The driver of the vehicle waited in the car, its motor still running, and after approximately two minutes, the curtains in the rear of the house were raised approximately four inches. At that time the defendant drove the car into the parking area. Only after the two men entered the house did other people begin to arrive and leave. The arresting officer conducted the surveillance until shortly after noon. The officer testified that he returned to the house at night a second time, again finding that the house was dark and had no vehicles around it.

On the morning of November 18, the day of the arrest, the arresting officers arrived at approximately 7:45 a. m. They saw no lights on in the house, no cars parked in front of it, and no signs of activity. At approximately 8:45 a. m., two men—not the two "Mexicans"—arrived, but they did not go into the house. Instead they sat talking with one another in one car until about 9:15 a. m. when the defendant and his passenger drove his car into the driveway. Just as the day before, the defendant's passenger got out of the vehicle and went into the house. The defendant stayed in the automobile with the motor running, and within a couple of minutes the curtains in the kitchen were raised approximately four inches. Seeing this signal, the defendant parked his car. The two men who had arrived prior to the defendant remained outside and at no time that morning did they go into the house. As the defendant started to go inside the house, the arresting officers ran up to him and arrested him. They also arrested the other two men who were waiting to go inside the house. At this point it was clear that no one except the defendant's passenger ever went into the house.

The record is replete with evidence that the informant's information was correct in that the house was used solely as a place where during the day people could come and purchase heroin. No one resided at the house, and the police surveillance clearly showed that no one was in the house prior to the arrival of the defendant and his passenger. The record is clear, therefore, that the police had no reason to believe any other person was inside that house at the time they arrested the defendant's companion just inside the door of the house.

There was, therefore, no justifiable reason for the arresting officers not to have obtained a search warrant to search those rooms other than the one in which the arrest was made. The majority opinion, in my view, ignores long-established constitutional rules that require the issuance of a search warrant under the authorization of a magistrate.

MAUGHAN, J., having disqualified himself, does not participate herein.