**STATE of Utah, Plaintiff and Appellee,**

v.

**Quetzalcohual CHAPMAN, Defendant and Appellant.**

No. 910529–CA.

Court of Appeals of Utah.

Nov. 12, 1992.

Brooke C. Wells, Joan C. Watt (argued), Salt Lake Legal Defender Ass'n, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., J. Kevin Murphy (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before GARFF, JACKSON and ORME, JJ.

JACKSON, Judge:

Defendant Chapman filed this interlocutory appeal from an order denying his motion to suppress evidence obtained as a result of a police stop. We affirm.

## FACTS

On January 25, 1991, at about 10:00 to 10:30 p.m., Officer Rasmussen of the Granite School District saw a Jeep Wagoneer parked in the parking lot of Central High School. The Wagoneer was the only vehicle on the school grounds, and Chapman and a young woman were sitting in the back seat of the Wagoneer.

Officer Rasmussen believed the two people in the Wagoneer were violating a Salt Lake County ordinance that prohibits any person from loitering, idling, wandering, strolling, or playing about school grounds without "lawful business."

Officer Rasmussen pulled behind the Wagoneer with his emergency lights on, approached the vehicle, and identified himself as a police officer. The officer observed no suspicious behavior from Chapman or the young woman. He questioned them about their presence on school property and they answered that they were parked there just "talking and stuff." Officer Rasmussen asked them for identification. The young woman, who owned the Wagoneer, provided her driver's license. Chapman, who had no identification, spelled his name for the officer.

The officer told the two to remain seated and returned to his cruiser where he initiated a driver's license and warrants check. Another patrol officer, Ellertson, heard Chapman's name over his radio and promptly radioed Officer Rasmussen to inform him that three weeks earlier, he had been told that Chapman was a gang member, known to carry a weapon. Officer Ellertson warned Rasmussen to be careful and drove to the school to assist him.

When Ellertson arrived a few minutes later, the two officers approached the car and asked Chapman to step out of the car. Officer Rasmussen informed Chapman of the information they had that he was a gang member, known to carry a weapon. The officer conducted a pat-down search and found no weapon. Officer Rasmussen then asked Chapman if he was armed. Chapman replied that he did not have a weapon on him, but that a weapon was in the fanny pack on the floor under the front seat of the car.

The officers asked permission to search the vehicle for the weapon. The owner of the car consented to the search. When the officers located the fanny pack, they held it up and Chapman nodded. The officers opened the fanny pack and removed a weapon. The gun clip contained bullets but no bullet was in the firing chamber of the weapon.[1]

Chapman was then arrested, handcuffed, and given his *Miranda* warnings. Officer Rasmussen testified that he arrested Chapman for violation of the trespass ordinance. The officers ran a computer check on the weapon and received notice that it had been stolen. The Officers again gave Chapman the *Miranda* warnings and he agreed to talk with them. Chapman stated he had stolen the weapon in a residential burglary. He then pointed out the burglary site to the officers. Chapman was taken to the police station, where *Miranda* warnings were repeated, and he again admitted to the burglary. He was then booked into jail and charged with burglary, a second de-

---

1. Officer Rasmussen testified that he received a negative result on the warrants check on porta- ble radio after the search of Chapman and possibly after discovery of the weapon.

gree felony, in violation of Utah Code Ann. § 76–6–202 (1990).

## ISSUES

Chapman raises the following challenges to the trial court's findings and conclusions on appeal: (1) his detention and arrest were unlawful because the county ordinance is unconstitutional; (2) Officer Rasmussen did not have reasonable suspicion to stop and detain him; and (3) the officer did not have probable cause to arrest him.

## CONSTITUTIONALITY OF THE ORDINANCE

Chapman contends the officer could not have had reasonable suspicion that he violated the county ordinance because the ordinance is void for vagueness under the Fourteenth Amendment and is in conflict with general state law in violation of the Utah Constitution. Chapman also argues the officer lacked probable cause to arrest him under the ordinance simply because the officer should have known the ordinance was invalid and would be judicially declared unconstitutional.

▮▮▮▮ Even if this court were to determine the ordinance unconstitutional, Chapman's stop and subsequent arrest under the ordinance would still be valid. A stop or arrest made pursuant to an officer's good faith reliance on an ordinance not yet declared unconstitutional is valid, regardless of a subsequent judicial determination of its unconstitutionality. *Illinois v. Krull*, 480 U.S. 340, 349–50, 107 S.Ct. 1160, 1167, 94 L.Ed.2d 364 (1987); *Michigan v. DeFillippo*, 443 U.S. 31, 37–38, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *United States v. Landry*, 903 F.2d 334, 339 (5th Cir.1990). Moreover, police are charged to enforce laws unless and until they are declared unconstitutional. *DeFillippo*, 443 U.S. at 38, 99 S.Ct. at 2632. Chapman

presented no justification for finding Officer Rasmussen lacked a good faith belief that the ordinance was valid. Thus, Officer Rasmussen's reliance on the county ordinance to detain and subsequently arrest Chapman was valid. Accordingly, we need not reach the issue of whether the ordinance is unconstitutional.

## LEGALITY OF STOP: REASONABLE SUSPICION

▮▮▮ Chapman contends that even if the ordinance is constitutional, the trial court clearly erred in finding that the initial detention by Officer Rasmussen was supported by reasonable suspicion.[2] Whether the required reasonable suspicion is present to support an investigatory detention by a police officer presents a question of fact. *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987). We review factual findings underlying the grant or denial of a motion to suppress under the "clearly erroneous" standard. *State v. Ashe*, 745 P.2d 1255, 1258 (Utah 1987); *State v. Robinson*, 797 P.2d 431, 435 (Utah App.1990). An officer has reasonable suspicion to stop any person when objective facts exist that "would lead a reasonable person to conclude [the subject] had committed or was about to commit a crime." *State v. Trujillo*, 739 P.2d 85, 88 (Utah App.1987); *accord* Utah Code Ann. § 77–7–15 (1990).

▮▮▮ The trial court found Officer Rasmussen reasonably suspected unlawful activity as he approached Chapman. The trial court also found the officer justifiably detained Chapman because of his belief that Chapman was in violation of a county ordinance prohibiting a person from being on school property without a "lawful purpose."

Chapman asserts that all the factors justifying reasonable suspicion listed by the

---

**2.** Defendant's claim that the stop or "detention" for violation of the ordinance was a pretext to search for evidence of a more serious crime also fails because a reasonable officer *would* have detained the defendant for the violation absent any unconstitutional motivation. *See State v. Lopez*, 831 P.2d 1040, 1044 (Utah App.1992). Officer Rasmussen testified that it was "stan-

dard operating procedure" for persons believed to be violating the trespass ordinance to be stopped, for the officer to run a license and "wants and warrants" check, and then for the officer to warn or cite them for trespassing. Officer Rasmussen did not deviate from that procedure. Accordingly, we determine the stop was not a pretext stop.

trial court are consistent with innocent behavior and thus, cannot amount to reasonable suspicion. The factors enumerated by the trial court were "the lateness and darkness of the hour, the emptiness of the school grounds, the presence of a young teenage female in the vehicle and the fact that Chapman had no apparent lawful business at the school." The trespass ordinance clearly prohibits people from loitering about school grounds in vehicles without any lawful business. The trial court's findings of fact show that a reasonable person would conclude Chapman had violated the ordinance.[3]

## PROBABLE CAUSE TO ARREST

■ Chapman further claims that even if the ordinance is constitutional, the officers did not have probable cause to arrest him. The determination of whether probable cause exists "depends upon an examination of all the information available to the searching officer in light of the circumstances as they existed at the time the [arrest] was made." *State v. Dorsey*, 731 P.2d 1085, 1088 (Utah 1986); *see also Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). "The trial court's findings as to the facts and circumstances pertaining to probable cause will not be overturned on appeal unless it appears that the trial court clearly erred." *Dorsey*, 731 P.2d at 1088; *accord State v. Rocha*, 600 P.2d 543, 545 (Utah 1979); *State v. Bartley*, 784 P.2d 1231, 1236 (Utah App.1989).

Utah Code Ann. § 77-7-2 (1990) provides that officers can make an arrest with or without a warrant. An arrest may be made without a warrant if "from the facts

known to the officer, and the inferences which fairly might be drawn therefrom, a reasonable and prudent person in his position would be justified in believing that the suspect had committed the offense." *State v. Leonard*, 825 P.2d 664, 669 (Utah App. 1991) (quoting *State v. Hatcher*, 27 Utah 2d 318, 495 P.2d 1259, 1260 (1972)).

The trial court determined Officer Rasmussen had probable cause to believe Chapman had committed a public offense of "unlawful acts about schools" when he arrested him. Chapman claims the officer did not have probable cause because the officer did not know Chapman's purpose for being on the grounds and had no information that he was there for illegal purposes.

When the officer arrested Chapman, he knew the county ordinance provided that a person commits an offense if that person loiters or idles on or about school grounds, either on foot or in a vehicle, without having some lawful business to be there. The officer observed Chapman's presence on the school grounds, the lateness of the hour, the emptiness of the school grounds, and the presence of a young teenage female in the vehicle. Moreover, Chapman's response that he was there just "talking and stuff" indicated he had no lawful business at the school. The trial court did not commit clear error in finding this information justified Officer Rasmussen's belief that Chapman was violating the county ordinance in his presence.

Thus, we conclude the trial court was correct in its denial of Chapman's motion to suppress and in its finding of probable cause for his arrest.[4]

---

3. Chapman also contends that even if the stop was lawful at its inception, Officer Rasmussen lacked reasonable suspicion of criminal activity sufficient to detain him longer while initiating an information check. Because we agree with the trial court that reasonable suspicion, if not probable cause, existed from their initial encounter, we conclude the further detention was permissible.

4. Officer Rasmussen's search of Chapman after the initial stop was also constitutional because if an officer has probable cause to arrest, he is entitled to search the person without any addi-

tional justification. *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). An officer's conduct is not unreasonable if he makes the search before instead of after the arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980). Officer Rasmussen had probable cause to arrest Chapman even before receiving the information concerning the weapon and before the search of Chapman. Therefore, regardless of the information concerning a possible weapon, Officer Rasmussen was entitled to conduct the search.

## CONCLUSION

Accordingly, we affirm the trial court's denial of Chapman's motion to suppress evidence.

GARFF, J., concurs.

ORME, Judge (dissenting):

While the majority focuses its analysis on whether the police officer had reasonable suspicion to stop the defendant, I believe this case turns on whether the search of his person and related interrogation exceeded the scope of appropriate detention given the purpose for which he was stopped. Because the majority relegates the determinative issue to passing mention in a footnote, and therefore reaches an incorrect legal conclusion, I respectfully dissent.

When a police officer stops an automobile and detains the occupants for even a brief period, a seizure occurs and Fourth Amendment rights must be considered. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). *Accord State v. Lovegren*, 829 P.2d 155, 157 (Utah App.1992). The circumstances surrounding the present encounter demonstrate that the defendant did not believe he was free to leave and that he was therefore seized for Fourth Amendment purposes. *See United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he

was not free to leave."). *Accord State v. Trujillo*, 739 P.2d 85, 87 (Utah App.1987). Thus, we must determine not only whether the police officer was initially justified in stopping and investigating defendant for violation of the school trespassing ordinance, but also whether the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). *Accord Lovegren*, 829 P.2d at 157.

Here, the initial reason for the stop was either to warn defendant and his friend to move on or to issue a citation to them because they appeared to be violating the school trespass ordinance.[1] I agree with the majority that the police officer possessed reasonable suspicion to initiate a stop, based on his belief that the occupants of the vehicle were in violation of the school trespass ordinance. Nonetheless, the period of detention required to either warn or issue a citation is brief.

Arguably, the officer was also justified in performing a warrants check because "[a]n officer may communicate with others ... in order to ... learn whether [an] individual is 'otherwise wanted,' unless doing so makes the period of detention unduly long." *State v. Figueroa–Solorio*, 830 P.2d 276, 280 (Utah App.1992) (quoting *Michigan v. Summers*, 452 U.S. 692, 700–01 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981)).[2] The length and scope of detention must be " 'strictly tied to and justified by the circumstances which ren-

---

1. As recognized by the majority, Officer Rasmussen's practice was ordinarily to warn and occasionally to cite for violation of this ordinance, which he characterized as the "righteous purpose" ordinance. It was not his practice to arrest violators of the ordinance. It is clear that the arrest in this case did not occur simply because the ordinance was violated. Rather, defendant was arrested because a dangerous weapon had been uncovered in the course of his detention. There was, however, no justification for the searches which culminated in discovery of the weapon.

2. In *State v. Johnson*, 805 P.2d 761, 763 (Utah 1991), the Utah Supreme Court held that police officers, who initially stopped a car for faulty

brake lights, were not justified in conducting a warrant check on a passenger after she satisfactorily answered initial inquiries. *Id.* at 764. The *Johnson* court reasoned that "the leap from asking for the passenger's name and date of birth to running a warrants check on her severed the chain of rational inference from specific and articulable facts and degenerated into an attempt to support as yet 'inchoate and unparticularized suspicion or "hunch." ' " *Id.* (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883). In fact, Officer Rasmussen testified that the reason he detained Mr. Chapman, rather than letting him go after warning him about the violation of the ordinance, was that he had a "hunch" concerning criminal activity.

dered its initiation permissible.' "[3] *Terry v. Ohio*, 392 U.S. at 19, 88 S.Ct. at 1878 (quoting *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967) (Farlas, J., concurring)).

In this case, the warrants check ultimately proved negative—defendant was not the subject of any outstanding warrants. While waiting for an answer to his warrants inquiry, the officer was not entitled to bide his time by conducting a frisk, which although brief is an "intrusion upon cherished personal security." *Terry*, 392 U.S. at 25, 88 S.Ct. at 1882. Simply put, nothing about this encounter justified the officer to extend the detention beyond the circumstances that justified the stop initially. *Lovegren*, 829 P.2d at 158 ("[O]nce the reasons for the initial stop of the vehicle have been completed, the occupants must be allowed to proceed on their way.").

The question becomes: Was it proper in this case to ask defendant to exit the car, to search him, and then to inquire about the contents of the vehicle? I see only two potential bases for extending the scope of the detention which could validate the patdown of defendant and the related inquiry which ultimately led to the discovery of a weapon: First, the frisk might be proper as a *Terry* frisk; second, the search of defendant and ensuing search of the vehicle might be sustained as a weapons search.

### A. *Terry* Frisk

"[W]hether it is proper to make a protective search incident to a stopping for investigation is a question separate from the issue of whether it is permissible to stop the suspect; not all stops call for a frisk." 3 Wayne R. LaFave, *Search and Seizure*, § 9.4(a) at 505 (2d ed. 1987). The *Terry* court ruled that a police officer can conduct an outer clothing frisk only if he concludes that "the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. In the instant case, nothing about the nature of the offense or anything the officer himself had observed suggested defendant might be armed and dangerous.[4] Obviously, there is no reasonable relationship between a suspected violation of a school trespass ordinance, where the violation consists of conversation in a car parked in a school parking lot, and suspicion that the perpetrators are armed. Only the information radioed by Officer Ellerston linked defendant to a possible weapon, but his report was based on hearsay or rumor and dealt only with a prior occasion when defendant was allegedly armed.[5] This is sim-

---

**3.** The United States Supreme Court has ruled that any detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). This court has adopted the rule "that running a warrants check in the course of a traffic stop is permissible, so long as it does not significantly extend the period of detention beyond that reasonably necessary to effectuate the original purpose of the stop." *State v. Figueroa-Solorio*, 830 P.2d 276, 280 (Utah App.1992). Although the warrants check here may have exceeded the time required to warn or cite the occupants, it is unnecessary to determine whether the warrants check itself violated this doctrine because the illegality of the searches, wholly aside from the length of detention, is dispositive.

**4.** The nature of the offense being investigated can itself permit a frisk. *E.g., State v. Carter*, 707 P.2d 656, 660 (Utah 1985) ("police officer may lawfully frisk a burglary suspect" because it is reasonable to believe burglars are armed).

**5.** During the hearing on the motion to suppress, Officer Rasmussen testified that he received a radio transmission from Officer Ellerston which provided him with a reason to frisk the defendant.

> Officer Rasmussen: When I gave the information over our radio, to the dispatcher, I was informed by one of my officers to use caution on that party, that he had—that the male party, that he had—was a gang member, and that he was known to carry a weapon.

Later in the hearing, Officer Ellerston explained the basis for his warning:

> Q: Let me stop you for a minute. You indicated that you knew Mr. Chapman was known to be armed.
> A: From the information that I had received.
> Q: Let's talk about that. You had information that on some prior occasion Mr. Chapman had carried a gun?
> A: That's right.
> Q: But you had no information to indicate that on January 25, 1991 that he was armed?
> A: However, I have not—at that point I had not received any information to state the contrary, that he wasn't armed.
> Q: I understand that. My question to you is this. Did you have any information to indicate that he was armed on January 25, 1991?

ply not enough. *See, e.g., State v. Giltner*, 56 Haw. 374, 537 P.2d 14, 17 (1975) (when officer questioned men about a complaint of rowdiness, defendant's reputation for carrying arms was insufficient basis for frisk even though officer had personal knowledge that defendant had been previously armed); *Simpler v. State*, 318 Md. 311, 568 A.2d 22, 27 (1990) (officer stopped defendant and others for underage drinking; although police officer had seen defendant carrying a weapon on prior occasion, he was not justified in conducting frisk); *People v. Russ*, 61 N.Y.2d 693, 472 N.Y.S.2d 601, 602, 460 N.E.2d 1086, 1087 (1984) (where anonymous informant told police that woman in a car, which looked like defendant's and was in same location, gave a man a handgun, police frisk was unjustified). *Cf. Cooper v. State*, 297 Ark. 478, 763 S.W.2d 645, 646–47 (1989) (officer entitled to frisk after traffic stop where he recognized defendant as local drug dealer arrested recently with a gun and also saw bulge in hip pocket); *State v. Holbrook*, 33 Wash.App. 692, 657 P.2d 797, 799 (1983) (officer justified in frisking defendant after traffic stop, where he recognized vehicle from "hotsheet," which stated specifically that drugs and a gun were to be found under left dashboard).

Officer Rasmussen was required to possess reasonable, articulable suspicion for his further "invasion of a citizen's personal security." *Terry*, 392 U.S. at 19, 88 S.Ct. at 1879. *See also Lovegren*, 829 P.2d at 158 (court must focus on whether officer had reasonable articulable suspicion of criminal activity to justify further detention); *State v. Parker*, 834 P.2d 592, 595

(Utah App.1992) ("Any further temporary detention for investigative questioning ... is justified ... only if the detaining officer has reasonable suspicion of serious criminal activity."). Such a basis was wholly lacking here.

### B. Weapons Search

Closely related to the *Terry* frisk but conceptually distinct from it is the "weapons search." *See generally, Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The two are different both in terms of when they are conducted and the scope of the search. The *Terry* frisk typically occurs at the outset of an investigative encounter, while the weapons search is ordinarily based on observations made during the course of the encounter. The *Terry* frisk is classically an outer body patdown while the weapons search can be more expansive, typically including the search of a nearby vehicle. The two are alike, however, to the extent that both require an articulated basis for being reasonably concerned, under the circumstances, about safety.

This court has recently analyzed the weapons search doctrine in *State v. Bradford*, 839 P.2d 866 (Utah App.1992), and there is no need in this opinion to go beyond summarizing what we said there. The *Bradford* court reiterated that even in roadside traffic stops, which are recognized as being potentially dangerous situations, an officer may conduct a weapons search only if he "reasonably believes a suspect is dangerous and may obtain immediate control of weapons." *Bradford*, 839 P.2d at

---

A: On that particular day, no.

Q: You had information that some months, when I say months plural, more than one month, months before he had been observed to have a firearm in his possession?

A: At that particular time it was three weeks.

Q: Some weeks before?

A: Right.

Q: He had been observed to have a firearm; is that true?

A: That's true.

Q: In terms of him ever possessing a firearm prior to that or subsequent to that, you had no information?

A: The information that I did have was stated by a couple of witnesses that said that—I

realize this is kind of secondhand information.

Officer Rasmussen was somewhat inconsistent about the precise sequence of information he received over the radio. On cross-examination, he agreed Officer Ellerston's comment was possibly received after the negative warrant check information. On redirect, he was persuaded that he received Officer Ellerston's radio report before the warrant information was received. The discrepancy is inconsequential. The pivotal problem in this case is that the radio report from Officer Ellerston, without more, was not a sufficient basis on which to frisk defendant at *any* point in time.

870. Thus, a protective weapons search is justified only if "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety ... was in danger." *Id.* (quoting *State v. Roybal,* 716 P.2d 291, 293 (Utah 1986)).

Most commonly, courts justify such searches if the officer observes the presence of a weapon, if the officer witnesses furtive movements that appear to be aimed at retrieving a weapon, or when the nature of the underlying offense raises reasonable suspicion that a weapon is present. *See, Bradford,* 839 P.2d at 869. In *Bradford,* for example, the first two conditions were present. The court held that an officer was justified in conducting a weapons search when he noticed the driver pull a black bag towards the front of the car from an area where a few minutes earlier the officer observed a rifle. *Bradford,* 839 P.2d at 868.

Applying the weapon search doctrine to this case, the result is the same as under the foregoing *Terry* frisk analysis. Nothing about the nature of the underlying offense being investigated prompted a concern for safety. *See* note 4, *supra.* Nothing defendant did, by way of conduct, attitude, or gesture, suggested the presence of a weapon in the vehicle. Again, the officer acted only on the basis of the radioed commentary he received from Officer Ellerston. Under the same authority outlined in the *Terry* context, that report was not a reasonable basis for concluding that defendant might have a firearm in his vehicle on this occasion.

6. In *State v. Grovier,* 808 P.2d 133 (Utah App. 1991), this court stated that "reasonable suspicion may be premised upon an informant's tip so long as it is sufficiently reliable." *Id.* at 135. In that case, an informant, who had provided accurate information ten to fifteen times before, gave police information concerning a specific car, carrying a specific drug at a specific time in a specific location. In the instant case, there is no showing of reliability or specificity. The information came from an unidentifiable source concerning a rumor about the defendant's behavior in the past.

7. In footnote 4 of the majority opinion, it is suggested the search of defendant can be sustained as a search incident to arrest. The majority, confronted with the fact the arrest oc-

Officer Ellerston admitted he had no reason to believe the defendant was armed on the night in question and he further described the information concerning defendant's possession of a gun weeks before as "second-hand." [6] *See* note 5, *supra.* I would hold that, as a matter of law, a mere rumor that a person has carried a weapon on some prior occasion does not constitute the reasonable, articulable suspicion required for conducting a weapons search under the Fourth Amendment. Because the illegal search of defendant's person led the officers to ask for permission to search the car and to discover the gun, the gun should be excluded as evidence.[7] *See, e.g., State v. Carter,* 812 P.2d 460, 470 (Utah App.1991) (if consent is not sufficiently attenuated from illegal detention, evidence seized must be suppressed).

curred after the search of defendant, the search of the vehicle, and discovery of the gun, takes comfort in the line of cases holding it does not matter whether a search incident to arrest precedes or follows the arrest. The doctrine does not fit here, where defendant would not have been arrested but for discovery of the gun. It is circular illogic to validate the search which uncovered the evidence which resulted in arrest as being incident to the arrest, where the arrest would not have occurred absent finding the gun. Any suggestion that Officer Rasmussen could properly have arrested defendant just for violation of the ordinance is belied by the officer's testimony that he simply did not arrest for violation of the "righteous purpose" ordinance— he typically only asked the offender to move on.