STATE of Utah, Plaintiff and
Appellant,

v.

Adolfo Diaz MENDOZA, Defendant
and Respondent.

STATE of Utah, Plaintiff and
Appellant,

v.

Alberto Ruiz MENDIETA, Defendant
and Respondent.

No. 20922.

Supreme Court of Utah.

Dec. 1, 1987.

David L. Wilkinson, David B. Thompson,
Salt Lake City, Peter L. Rognlie, St.
George, for plaintiff and appellant.

J. MacArthur Wright, John Miles, St.
George, for defendant and respondent Mendoza.

John E. Meyers, Los Angeles, California,
for defendant and respondent Mendieta.

DURHAM, Justice:

The State brought this appeal to challenge the trial court's suppression of evidence obtained during a search of the car in which defendants were traveling. The State assigns as error the trial court's use of a probable cause standard to determine the validity of the stop, the trial court's

finding that defendants had standing to challenge the validity of the search, and the trial court's failure to make findings pursuant to Utah Code Ann. § 77–35–12(g) (1982). We affirm.

The following summary of the facts is based on testimony from both the suppression hearing and the preliminary hearing. The trial judge relied on testimony from both in granting the motion to suppress.

On March 16, 1985, two United States Immigration Service border patrol officers observed the northbound traffic on I–15 south of St. George, Utah, from a car parked on the median for that purpose. Their car was green, with official decals on both doors and a light bar mounted on the roof. At approximately 4:50 a.m., three cars approached the officer's position, including the black Mustang in which defendants were traveling. Officer Stiegler testified that his partner, Officer Fox, told him that the car deserved a closer look because the occupants appeared to be of Latin descent. Officer Fox, however, testified at the suppression hearing that he could not remember making the statement concerning defendants' apparent ethnic origin.

Officer Fox, the driver of the border patrol car, pulled onto the highway and began to pursue the black Mustang. In order to catch up with it before it reached a rest stop, where the officers could view the car and its passengers with the aid of roadside lights, the officers followed the Mustang at high speed. When they caught up with defendants' vehicle, it failed to leave the left lane despite the officers' rapid approach; however, neither officer could testify that the occupants of the Mustang had seen the officers' car approach. The officers matched the Mustang's speed and followed at a distance of two to six feet. The officers then noticed that the Mustang had California license plates.

The Mustang eventually pulled into the right lane and decelerated rapidly. Both officers described the car's movements as "jerky." The officers pulled alongside the Mustang, dropped back, and then pulled alongside the car again. With the aid of the lights from the rest stop, the officers determined that defendants appeared to be of "Latin descent" and behaved "nervously." When asked to describe defendants' behavior more specifically, however, the officers testified only that defendants avoided eye contact with the officers. Based on the time of year, the California license plates on the car, defendants' "nervous" behavior, defendants' physical characteristics, and the "jerky" driving, the officers decided to pull the Mustang over and question defendants concerning their citizenship status.

The officers questioned both defendants, and neither was able to produce adequate identification. The officers arrested defendants and placed them in the back of the officers' car. At this point, the officers opened the trunk of the Mustang to determine if it contained any other passengers and discovered the fifty-one bags of marijuana that were the subject of the motion to suppress.

We consider first the propriety of the initial stop. The State contends that the trial judge improperly assessed the validity of the stop under a probable cause standard instead of the appropriate "reasonable suspicion" standard. The plain language of the suppression order does not, however, support the State's position. The order reads, "[T]here were no (articulable) facts as a basis *or* probable cause for the stop." (Emphasis added.) Use of the disjunctive indicates that the trial judge found not only a lack of probable cause, but also a lack of any basis whatsoever for the stop. The transcript of the trial court's ruling supports this interpretation. The transcript indicates that the trial judge found "there was no basis for the original stop," without making any reference to a lack of probable cause. Although inclusion of the probable cause language in the order confuses the standard applied by the trial court, that language does not indicate that the trial judge suppressed the evidence in question solely because the facts failed to meet the more restrictive probable cause standard.

■ Even under the "reasonable suspicion" standard announced in *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95

S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975), the facts known to the border patrol officers at the time they stopped the Mustang did not justify the stop. In *Brignoni–Ponce,* the United States Supreme Court reviewed the propriety of a stop, based solely on the "Mexican" appearance of a vehicle's three occupants, to investigate the possible transportation of illegal aliens. The Court held, "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific, articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* The sole fact relied upon by the border patrol officers in *Brignoni–Ponce* was the "apparent Mexican ancestry" of the vehicle's occupants. *Id.* at 885–86, 95 S.Ct. at 2582–83. The Court held that apparent Mexican ancestry alone did not furnish "reasonable grounds to believe that the three occupants were aliens." *Id.* at 886, 95 S.Ct. at 2582.

In *Brignoni–Ponce,* the Court listed several factors for consideration in determining if the officers had reasonable suspicion to justify the stop of the suspect vehicle: (1) the characteristics of the area, including its proximity to the border, usual traffic patterns, and previous experience with alien traffic; (2) information concerning recent border crossings in the area; (3) the driver's behavior, including erratic driving or an obvious attempt to evade officers; (4) the characteristics of the vehicle itself, such as its size and observations indicating that the vehicle is heavily loaded; (5) whether the occupants of the vehicle are trying to conceal themselves; and (6) whether the occupants have a characteristic Mexican appearance, i.e., particular style of haircut or dress. The officer is entitled to assess the facts available to him in light of his experience. *Id.* at 884–85, 95 S.Ct. at 2581–82. In determining whether the facts support a reasonable suspicion that a vehicle is engaged in illegal activity, the trial court must consider the totality of the circumstances facing the officers. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621

(1981). The reviewing court should not overturn the trial court's determination unless it is clearly erroneous. *Id.* at 416; *see also State v. Gallegos,* 712 P.2d 207, 208–09 (Utah 1985). A review of the facts in this case indicates that the trial judge's order suppressing the questionable evidence was not clearly erroneous.

The officers in this case relied on the following facts in determining that they had a reasonable suspicion justifying the stop of the Mustang: (1) the apparent "Latin descent" of the occupants of the Mustang; (2) the route of travel; (3) the time of day; (4) the time of year; (5) the California license plates; (6) the erratic driving pattern; and (7) the nervous behavior of the occupants.

As to the first factor, Officer Stiegler simply testified that the occupants of the Mustang appeared to be of "Latin descent." He did not identify any characteristics observed before the stop, such as clothing or haircut, that would indicate Mexican nationality. Many United States citizens and residents have physical characteristics that might be classified as Latin. Without other observations concerning physical characteristics that would indicate alien status, Latin appearance has only minor probative value in determining if a suspect has entered the country illegally.

Likewise, the Mustang's route of travel and California license plates have little probative value in determining if the officers had a reasonable suspicion to stop the vehicle. The officers testified that I–15 is frequently used by those involved in transporting illegal aliens from the California-Mexico border to destinations north and east of California. However, I–15 is also the only major interstate highway for legal traffic to locations northeast of Southern California. It seems unlikely that illegal alien transporters comprise a significant portion of interstate traffic on I–15 at distances as far from the Mexican border as St. George, Utah.

Similarly, the time of year and the time of day of the stop have little relevance. Although the density of the traffic on I–15 varies, travelers use the interstate highway

at all times of the day and night and at all times of the year. *See, e.g., United States v. Shields,* 534 F.2d 605, 608 (5th Cir.1976). *But cf. United States v. Quiroz–Carrasco,* 565 F.2d 1328, 1330 (5th Cir.1978) (defendants stopped on a road at a time when virtually no local traffic was present).

The officers also testified that they relied on defendants' erratic driving behavior in deciding to stop the Mustang. When asked to describe this behavior more specifically, however, they merely cited defendants' initial failure to yield the left lane to the approaching patrol car and their subsequent lane change and rapid deceleration. We do not see how this behavior would give rise to a suspicion that the occupants of the car were engaged in illegal activity. Defendants made no attempt to evade the officers; rather, they changed lanes and slowed down. If anything, defendants' conduct facilitated their apprehension by the officers.

The final fact relied upon by the officers was defendants' "nervous behavior.' When asked to describe defendants' behavior more specifically, the officers merely stated that defendants' had a "white-knuckled" or rigid look and failed to make eye contact. The Fifth Circuit Court of Appeals has held that the failure to make eye contact can have no weight in determining if the officers had a reasonable suspicion to conduct an investigatory stop. *United States v. Pacheco,* 617 F.2d 84, 86–87 (5th Cir.1980); *United States v. Lopez,* 564 F.2d 710, 712 (5th Cir.1977).

Additionally, several of the factors listed in *Brignoni–Ponce,* 422 U.S. at 885–86, 95 S.Ct. at 2582–83, are absent here. Defendants did not try to evade the officers, nor did they attempt to conceal anyone or anything when the officers began pursuing the Mustang. The car did not meet the typical profile of a vehicle used for smuggling, nor was there any indication that the vehicle was heavily loaded. *See United States v. Garcia,* 732 F.2d 1221, 1224–25 (5th Cir. 1984) (several factors including the appear-

ance of the occupants and the heavily loaded truck were sufficient to uphold an investigatory stop). Finally, the officers stopped the car a considerable distance from the Mexican border.

Adopting the State's position would essentially authorize the stop of all northbound vehicles on I–15 containing "Latin-appearing" occupants and displaying suspect state license plates.[1] Such a holding would substantially interfere with the fourth amendment rights of those travelers. We hold that the facts in this case do not support a reasonable suspicion that defendants were engaged in illegal activity; therefore, the trial court's finding that the stop violated defendants' fourth amendment rights was not clearly erroneous.

Our holding that the investigatory stop violated defendants' fourth amendment rights obviates the need to discuss the propriety of the search. Because we find the stop itself unconstitutional, all evidence subsequently seized is inadmissible. *See, e.g., Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); 4 W. LaFave, *Search and Seizure* § 11.4(d), at 407–08 (2d ed. 1987).

Our holding as to the unconstitutionality of the initial stop also eliminates the necessity to address the standing issue. Because the State based its standing argument on the propriety of the search, and because the validity of the search does not affect our holding, we do not discuss defendants' standing to challenge the search.

We next turn to the State's challenge to the trial court's failure to make the findings required by Utah Code Ann. § 77–35–12(g) (1982), part of the Fourth Amendment Enforcement Act. Pursuant to that section, a trial court may only suppress evidence when it finds a substantial fourth amendment violation that was not made in good faith. A defendant must first prove a substantial violation by a preponderance of the evidence. The State must then prove good faith on the part of the police officer in order to prevent sup-

---

**1.** The officers testified that license plates from other states on the United States–Mexico border, as well as those from states that are the typical destinations for illegal alien traffic, would have aroused their suspicion.

pression of the evidence. The section further requires the trial court to state its reasons for finding a substantial violation and a lack of good faith. In considering this assignment of error, we first determine whether section 77–35–12(g) meets federal constitutional standards.

In *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the United States Supreme Court applied the exclusionary rule to the states by virtue of the fourteenth amendment. *Id.* at 655, 81 S.Ct. at 1691. As a result, the United States Constitution requires suppression of evidence seized pursuant to a search or seizure made in violation of the fourth amendment. In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), however, the Court created an exception to blanket application of the exclusionary rule. The Court held that the rule does not apply where the state establishes that an officer exhibited "objectively reasonable" reliance on a magistrate's probable cause determination and on the technical sufficiency of the search warrant issued. *Id.* at 922–23, 104 S.Ct. at 3420–21.

Although *Leon* involved a search conducted pursuant to a subsequently invalidated warrant, the State argues that the *Leon* holding does not restrict application of the "good faith" exception to warrantless searches. Admittedly, much of the language in *Leon* intimates a broader application of the rule. While the State correctly argues that no language in the *Leon* opinion specifically restricts application of the exception to searches pursuant to a warrant,[2] we do not agree that it can apply

to warrantless searches of the kind involved in this case.

The basis for the *Leon* exception is that the exclusionary rule serves no other purpose than to punish law enforcement officers for knowingly or negligently conducting a wrongful search and to deter such conduct in the future. *Id.* at 918–21, 104 S.Ct. at 3418–19. When, however, a police officer obtains a warrant and relies on it with objective reasonableness, exclusion of the evidence due to a subsequent invalidation of the warrant would serve no purpose. *Id.* Thus, the opinion's foundation is that excluding illegally-seized evidence when a police officer has received authorization to conduct a search, has restricted his search to the boundaries of the authorization, and has a reasonable basis for relying on the authorization would defeat the ends of justice.

■ Whether or not we agree with the *Leon* view of the exclusionary rule's purpose, the exception cannot operate in this situation for two reasons. First, no outside authority on which the officers could reasonably rely expressly authorized the search of the vehicle; therefore, the policy foundations of the *Leon* exception do not appear in searches of the kind involved in this case.[3]

Second, the *Leon* exception, by its own terms, could never apply to an investigatory stop and search. As we have already discussed, *Brignoni–Ponce* permits the use of evidence obtained during a search conducted after an investigatory stop only

---

**2.** We note that much of the language in *Leon* suggests a broader application of the rule. For example, the Court states that the exclusionary rule should not apply to objectively reasonable police activity and that this is especially true where the officer has obtained a search warrant and acted within its scope. *Leon*, 468 U.S. at 919–20, 104 S.Ct. at 3418–19. This language implies that all objectively reasonable police conduct should enjoy immunity from the exclusionary rule and that obtaining a warrant has the effect of creating an even greater presumption of validity of the police activity as long as the officer obtained the warrant in good faith. Because the statute, by its terms, applies to all motions to suppress evidence without distinguishing between motions to challenge warrant-

less searches from motions to challenge searches conducted pursuant to a warrant, only the broader application of the "good faith" exception suggested in the *Leon* dicta can justify the scope of the statute.

**3.** In *Illinois v. Krull*, —— U.S. ——, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the United States Supreme Court extended the *Leon* exception to a situation where the police conducted a search pursuant to a subsequently invalidated statute. *Id.*, 107 S.Ct. at 1167. *Krull* does not affect our characterization of *Leon*. In both cases, the officers conducting the searches did so in objectively reasonable reliance on prior, external authorization.

when articulable facts give rise to a reasonable suspicion. *Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. at 2581. In essence, this requires objectively reasonable conduct in the decision to search, the same objective reasonableness that an officer must exercise when relying on a subsequently invalidated search warrant. If no reasonable suspicion exists to justify an investigatory stop, rendering a subsequent search illegal, then the officer whose conduct is in question could not have acted reasonably. Thus, the *Leon* exception could never apply to an invalidated investigatory stop and search.

■ Because *Leon* could never apply to investigatory stops and searches, and because the Fourth Amendment Enforcement Act purports to create a "good faith" exception to such searches, that Act violates the fourth amendment to the United States Constitution.

■ Even assuming for the sake of argument that the "good faith" exception established by *Leon* applies to the type of search involved in this case, the statutes in question here are still unconstitutional. Section 77–35–12(g)(1) requires defendants to establish a substantial violation of their fourth amendment rights. A violation is "substantial" under section 77–35–12(g)(2) if

> (i) The violation was grossly negligent, willful, malicious, shocking to the conscience of the court or was a result of the practice of the law enforcement agency pursuant to a general order of that agency;
>
> (ii) The violation was intended only to harass without legitimate law enforcement purposes.

This threshold requirement is beyond the scope of the "good faith" exception for two reasons. First, *Leon* establishes an exception to the applicability of the exclusionary rule. *Leon,* 468 U.S. at 922, 104 S.Ct. at 3420. Pursuant to *Mapp,* if the defendant establishes a fourth amendment violation, the illegally-seized evidence must be suppressed regardless of the egregiousness of, or the intentions motivating, the police officers' conduct. *Mapp,* 367 U.S. at 655, 81 S.Ct. at 1691. Because *Leon* is an exception to the application of the exclusionary rule, the State must prove the necessary elements of the "good faith" exception. Section 77–35–12(g), however, shifts the burden of proof to the defendant, who must prove the equivalent of police conduct made in bad faith before the court can apply the exclusionary rule.

Subsections (i) and (ii) of section 77–35–12(g)(2) also exceed the bounds of the exception established in *Leon* because both require less than objectively reasonable conduct in order for section 77–35–12(g) to provide an exception. Pursuant to the broad reading of *Leon,* a court will not admit the illegally-seized evidence if it finds the police conduct objectively unreasonable. Conduct that is objectively unreasonable, however, is not equivalent to grossly negligent, willful, or malicious conduct; nor does it always arise from either an intent to harass or pursuant to department policy. Because subsections (i) and (ii) of section 77–35–12(g)(2) validate conduct that is not objectively reasonable under *Leon,* they are unconstitutional.

The state legislature indicated that if any part of section 77–35–12(g) was held invalid, the Fourth Amendment Enforcement Act would "be void in its entirety." H.B. 69, 44th Leg., Bud. Sess., 1982 Utah Laws ch. 10, § 16. Thus, our holding that the substantial violation requirement violates the fourth amendment of the United States Constitution renders invalid all of the statutes passed in the Fourth Amendment Enforcement Act. We therefore do not need to discuss the trial court's failure to make findings as to the officers' good faith.[4]

Because we affirm on other grounds the trial court's order suppressing the evidence, we do not reach the issues raised by defendants concerning a possible *Miranda* violation and the officers' lack of statutory authority to stop defendants.

---

**4.** The stop in this case and section 77–35–12(g) both fall below the standards required by the fourth amendment to the United States Constitution. We do not analyze the level of conduct required by Utah Constitution article I, section 14. We reserve this question for the future.

The decision of the trial court is affirmed.

STEWART, Associate C.J., concurs.

ZIMMERMAN, Justice: (concurring).

I join in the majority's analysis. However, I feel compelled to add several comments.

First, I find particularly outrageous the State's attempt to justify the stop of Mendoza and Mendieta by citing the fact that they reacted anxiously to the pursuit and surveillance conduct of the two INS officers. In the 4:50 a.m. darkness on March 16th, Mendoza and Mendieta were driving along I–15 in the left lane. Suddenly, a car approached from the rear at a very high rate of speed. When it approached the Mendoza/Mendieta vehicle, it abruptly slowed down and then trailed Mendoza and Mendieta at freeway speeds, separated from their rear bumper by only two to six feet. Only the headlights of the officers' car were illuminated. In the dark, there was nothing that would alert Mendoza and Mendieta that the vehicle behind them was a police car. Mendoza and Mendieta then pulled into the right lane and slowed down. At this point, they appeared "nervous" to the officers.

Any sane person would appear nervous if something like this occurred while traveling along a lonely stretch of one of our interstates in the early morning hours. I find ludicrous the State's argument that because these individuals appeared to have been unsettled by the officers' extraordinary conduct, the officers had justification for suspecting that something improper was going on, and on this basis, they were entitled to pull the vehicle over and institute an investigation that led to a search of the vehicle. This is pretextual fourth amendment gamesmanship at its worst.

Second, I agree with the majority that the "good faith" exception suggested in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), cannot be applied generally to warrantless searches.

However, even if this reading of *Leon* were in error, the Fourth Amendment Enforcement Act would not necessarily be saved. As I have observed previously in *State v. Hygh*, 711 P.2d 264, 271–74 (Utah 1985) (Zimmerman, J., concurring), the whole question of the protections that are afforded by and the remedies available under article I, section 14 of the Utah Constitution, our own search and seizure provision, has never been carefully considered by this Court.

HALL, Chief Justice: (concurring and dissenting).

Application of the clearly erroneous standard of review[1] prompts me to concur in affirming the judgment of the trial court. However, I reserve judgment as to whether the exclusionary rule as espoused in *United States v. Leon*[2] has application to a warrantless search. I also reserve judgment as to the constitutionality of Utah Code Ann. § 77–35–12(g) (1982) and whether it has application to a warrantless search.

HOWE, Justice: (concurring and dissenting).

I concur except I would not reach and determine the constitutionality of section 77–35–12(g), also known as rule 12(g), Utah Rules of Criminal Procedure. The majority correctly holds that the good faith exception to the exclusionary rule enunciated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), cannot apply to the warrantless search made in the instant case. For the same reasons and because of the inherent lack of good faith in their making, section 77–35–12(g) does not apply to such searches. *See* subparagraphs (3)(ii) and (iii) of section 78–35–12(g).

I would not attempt to apply the statute to a fact situation it was never intended to cover (warrantless search) and then because it is unconstitutional as there applied, declare the statute unconstitutional in all

---

**1.** Utah R.Civ.P. 52(a); *State v. Ashe,* 745 P.2d 1255, 1258 (Utah 1987).

**2.** 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

situations. I would reserve ruling on the constitutionality of section 77–35–12(g) until that question is presented in the context of a search conducted pursuant to a warrant.