BOWEN, Presiding Judge.
Josh B. Washington was indicted for possession of cocaine. He filed a pre-trial motion to suppress the cocaine, alleging that its seizure was the result of an illegal detention and search. After an evidentiary hearing, the trial court entered an order granting the motion to suppress. The State appeals from this order, pursuant to Rule 15.7, A.R.Crim.P. The judgment of the trial court is affirmed.
At the suppression hearing, Alabama State Trooper William D. Eller testified that early on the morning of April 14, 1991, he was operating a stationary radar on Interstate 65 approximately two miles south of Hope Hull, Alabama, where the speed limit is 65 m.p.h. Trooper Eller’s patrol car was equipped with a video camera that was automatically activated whenever the car’s blue lights were turned on.
At approximately 2:30 a.m., Trooper Eller stopped a northbound automobile that had produced a radar reading of 80 m.p.h. The defendant was the driver and the sole occupant of this car. In making the stop, Trooper Eller turned on his car’s blue lights, which activated the video camera. Eller testified that, after the defendant was stopped, he approached the defendant’s car and asked for the defendant’s driver’s license. He also informed the defendant that he had been stopped for speeding. According to Eller,
“[the defendant] gave me just a piece of paper, a temporary Louisiana driver’s license. It didn’t have a picture on it or anything. I asked him for further I.D. which he said that he didn’t have. I had also noticed that it was a rental car. It had a temporary plate on it in the window taped to the window. I asked him for a rental agreement which he gave me. And at that time I asked him to come back and have a seat in my patrol car.” R. 33.
The video tape from the camera in Eller’s patrol car visually depicts, without relevant sound, the defendant’s car as it stops just ahead of the patrol car, Eller’s approach to the defendant’s car, and Eller’s return to his patrol car accompanied by the defendant. Once Trooper Eller and the defendant are in *394 the patrol car, their conversation is recorded on the tape, although the tape continues to portray the defendant’s car. The video tape was played at the suppression hearing and was admitted into evidence. Consequently, both the trial court and this Court have had the rare opportunity to hear a large part of the actual conversation between Trooper El-ler and the defendant.
Eller and the defendant reached the patrol car at 2:34 a.m.[1] Eller asked the defendant if the Louisiana license was the only identification that he had. The defendant initially said that it was, then stated that his employee identification with his photograph on it was in the ear. There was no response by Eller, who testified at the suppression hearing that “for [his own] safety, once [he] get[s] somebody stopped, [he is] leery of letting somebody else go back up to the car.” R. 45^16. Eller also asked the defendant what state the license had been issued in and for his date of birth. The defendant promptly answered both questions.
At 2:35:36 a.m.,[2] after the above exchange, Eller asked the dispatch operator to check the defendant’s license in Louisiana. Thereafter, in response to Eller’s 'questions, the defendant stated that his mother-in-law had rented the car, that he was on his way to Atlanta, Georgia, that he was in the audiovisual business, that his company’s headquarters were in Atlanta, and that he went back and forth to Atlanta for various shows. At 2:38:36 a.m., the dispatch operator reported that the defendant’s Louisiana license was valid. At 2:39 a.m., Eller requested a “QH” on the defendant’s license. Eller asked the defendant how long he would be in Atlanta and the defendant replied that he would be there until Monday morning. Eller then observed aloud that the rental agreement had only the renter’s name as an authorized driver. At Eller’s request, the defendant provided his mother-in-law’s telephone number. At 2:41:08 a.m., the dispatch operator reported “Negative in Alabama. NCIC files are [unintelligible word].” The defendant stated that the rental agreement should have him listed as an additional driver.
Thereafter, in response to Eller’s questions or comments, the defendant provided the name of the company by which he was employed and the company’s Atlanta and New Orleans addresses; explained why he had a temporary driver’s license;[3] and stated that he had been in the audio-visual business for two years, but had been involved in the music industry for much longer. The defendant offered to give Trooper Eller the name of his supervisor and his work telephone number, but this information was declined by Eller. The defendant also informed Eller that he was to meet with singer Bobby Brown while in Atlanta and that he hoped that Brown would record one of his songs.
At 2:45:18 a.m., Trooper Eller began explaining the Uniform Traffic Ticket and Citation (UTTC) to the defendant. The defendant signed the UTTC, then asked some questions regarding payment of the ticket, which Eller answered. At 2:46:03 a.m., Eller stated: “There’s your copy of your ticket.” Immediately thereafter, at 2:46:11 a.m., Trooper Eller said, “We have a lot of problems with people hauling drugs up and down the interstates. Would you object to my looking in your car?” The defendant first answered no, then asked, “Is there a specific reason, something you looking for?” Trooper Eller replied, “Well, no. It’s just like what I explained to you just a second ago. We have a problem with people hauling drugs up and down the interstate. You know, illegal weapons and cash and stuff like that and out here on the interstates we just try to catch them out here and I just wondered if you’d mind if I search your car and make sure you don’t have nothing like that in your car.”
*395 When the defendant asked if he had to give Eller permission, Eller responded, “No, that’s up to you. I’ll explain this form.” Instead of explaining the consent- form, however, Eller then asked, “Have you ever been in jail for drugs or anything like that?” When the defendant acknowledged that he had been arrested, Eller probed further: “What for?” The defendant answered that he was arrested for possession of cocaine. At this point, 2:49:17 a.m., Trooper Eller requested the dispatch operator to run an “EPIC check” on the defendant.
There followed conversation indicating reluctance on the part of the defendant to permit Eller to search his car. The defendant asked if he could contact his attorney but was told by Eller that there was no way for him to do so. When the defendant asked if Eller could detain him if he refused to consent to the search, Eller replied, “Yes, for a little while, if that’s what I choose to do.” At 2:55:33 a.m., the defendant refused to consent to the search of his car. At 2:55:54 a.m., Trooper Eller radioed for a canine unit to be sent to the scene. While waiting for the canine unit to arrive, Eller learned that the defendant had two prior drug convictions.
At 3:29 a.m., Officer Craig Carr and a drug dog arrived on the scene. The dog alerted at the driver’s door of the defendant’s ear. Officer Carr testified that he searched the interior of the car and found approximately .2 grams of cocaine “wrapped inside a dollar bill in a notebook” in the front seat of the car. R. 20, 28. A search of the trunk revealed two “wad[s] of cash” inside a clothes bag. R. 26-27. The defendant was placed under arrest for possession of the cocaine at 3:51 a.m.
With certain limited exceptions enumerated in subsection (b), and not here applicable, Ala.Code 1975, § 32-1-4 prohibits traditional custodial arrests for misdemeanor traffic offenses where the offender is willing to sign the UTTC. See Sheffield v. State, 522 So.2d 4, 7 (Ala.Cr.App.1987); Hays v. City of Jacksonville, 518 So.2d 892, 893 (Ala.Cr.App.1987). However, § 32-1-4(a) does permit “limited detention or custody” of traffic offenders and, consequently, an officer may “requir[e] a motorist to sit in a patrol car while the officer completes the [UTTC].” Pittman v. State, 541 So.2d 583, 585 (Ala.Cr.App.1989) (citing United States v. Parr, 843 F.2d 1228, 1229-31 (9th Cir.1988). The limited detention permitted by § 32-l-4(a) does not give rise to a search incident to arrest of either the motorist’s person, State v. Davis, 477 So.2d 504, 506 n. 1 (Ala.Cr.App.1985); Thomas v. State, 453 So.2d 1075, 1077 (Ala.Cr.App.1984), or the motorist’s vehicle, see Morton v. State, 452 So.2d 1361, 1364 (Ala.Cr.App.1984), overruled on other grounds, Cannon v. State, 601 So.2d 1112 (Ala.Cr.App.1992). While the officer may conduct a limited protective search for weapons of the motorist’s person, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and car, Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), he “must have an actual suspicion that weapons are present” in order to do so, United States v. Lott, 870 F.2d 778, 784 (1st Cir.1989) (emphasis added). See generally 3 W. LaFave, Search and Seizure, §§ 9.4(a), (e) (2d ed. 1987).
Once the traffic offender signs the UTTC, the arresting officer is to “forthwith release him from custody.” § 32-l-4(a). The officer may further detain the driver only if he has probable cause to arrest the driver for some other non-traffic offense, see Hawkins v. State, 585 So.2d 154 (Ala.1991), or has a reasonable suspicion of the driver’s involvement in some other criminal activity justifying further detention for investigatory purposes under Terry v. Ohio, see United States v. Tapia, 912 F.2d 1367 (11th Cir.1990).
“Reasonable suspicion is a less demanding standard than probable cause.” Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). However, reasonable suspicion exists only if the officer has “specific, particularized, and articulable reasons indicating that the person [stopped] may be involved in criminal activity,” Hickman v. State, 548 So.2d 1077, 1080 (Ala.Cr.App.1989). “To determine whether reasonable suspicion existed for a particular stop, the totality of the circumstances, as knoum to the officer at the inception of the stop, [or, in this case, at the time of the continued detention,] must be considered.” *396 Arnold, v. State, 601 So.2d 146, 149 (Ala.Cr.App.1992) (emphasis added). Accord Lamar v. State, 578 So.2d 1382, 1385 (Ala.Cr.App.), cert. denied, 596 So.2d 659 (1991).
Trooper Eller’s testimony at the suppression hearing clearly established that the trooper had probable cause to stop the defendant and effect a non-custodial traffic arrest for the misdemeanor offense of speeding. It is also clear from both' the video tape and Trooper Eller’s testimony that the defendant was willing to and, in fact, did sign the UTTC. The question presented by this appeal is whether Trooper Eller had the necessary reasonable suspicion to continue to detain the defendant after the defendant had signed the UTTC.
When asked to “[g]ive the judge the factors that [he] looked at” in asking the defendant if he could search the car, Trooper Eller stated:
“Based on Mr. Washington, he had a temporary license, no concrete photographic license or anything. The car was a third person rental by somebody else. He was trying to tell me that he was authorized to drive it which in fact what I looked at said he couldn’t. The car having no concrete plates on it or anything, It had temporary plates. His nervousness to the point where I figured that there was something in the car.”
R. 40. As indicated by its reliance on United States v. Tapia, 912 F.2d 1367 (11th Cir. 1990), in the order granting the defendant’s motion to suppress, CR. 26, the trial court obviously found that these factors did not establish the reasonable suspicion necessary to detain the defendant after he had signed the UTTC. We agree.
In Tapia, an Alabama State Trooper stopped a vehicle for speeding on Interstate 59 North. The vehicle was occupied by two Mexican males, one of whom, the driver, could not comprehend or speak English. At the officer’s request, both men produced Texas driver’s licenses, both of which were valid, and the passenger obtained from the glove box an insurance card in a third party’s name. The passenger told the officer that the car belonged to his brother-in-law and that he and the driver were going to Atlanta, Georgia, to look for employment. The officer testified that, during these exchanges, the driver “seemed nervous and that his hands were shaking.” 912 F.2d at 1369. The officer saw no luggage inside the car other than one red overnight bag.
The officer asked the driver if he would consent to a search of the vehicle and the driver signed a consent to search form. During the search of the vehicle, the officer observed fresh scratch marks on the gas tank. Drug dogs were called to the scene and they alerted at the rear side panel on the driver’s side of the car. The car and its occupants were then taken to the trooper’s station where 45 pounds of compressed marijuana were found in the gas tank of the car.
The driver and the passenger were charged with possession of marijuana with intent to distribute. At the hearing on the defendants’ motions to suppress, the trial court held that the written consent to search was vitiated by the driver’s inability to read or comprehend the consent to search form. Nevertheless, the court denied the defendants’ motions to suppress, finding that reasonable suspicion to detain the defendants was established by the facts that
“the vehicle traveling along the interstate possessed a Texas tag; the individuals in the car were both Mexican; although the men informed the police officer that they were traveling to Atlanta to work there, there was no indication of luggage within the interior of the car, and the trunk did not appear to be heavily loaded; and the driver of the vehicle appeared to be shaking and nervous about being stopped.”
912 F.2d at 1369.
At trial, a jury acquitted the driver, but convicted the passenger. In reversing the passenger’s conviction, the Eleventh Circuit Court of Appeals stated:
“It is true, as reiterated recently by the Supreme Court in [United States v.] Sokolow, [490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989),] that factors not in themselves proof of illicit conduct and/or quite consistent with innocent travel can, when taken together, give rise to a reasonable suspicion of criminal or drug activity. [490 *397 U.S. at 9] 109 S.Ct. at 1586. Like the determination of probable cause discussed in Illinois v. Gates, the relevant inquiry in evaluating the presence of reasonable suspicion is ‘ “not whether particular conduct is ‘innocent’ or ‘guilty/ but the degree of suspicion that attaches to particular types of noncriminal acts.” ’ Sokolow, [490 U.S. at 10] 109 S.Ct. at 1587 (quoting Gates, 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2334-35 n. 13, 76 L.Ed.2d 527 (1983)). Nevertheless, we find that the factors cited by the district court in this case, e.g., being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama), do not provide a minimal, particularized basis for a conclusion of reasonable suspicion on the part of Officer Guthrie. Even when considered together and in light of all the facts, such observations fail to suggest that the [occupants of the vehicle] were engaged in any criminal activity other than speeding on the highway. Neither, for that matter, do any of the other allegedly ‘suspicious’ facts urged by the government, such as [the driver’s] looking away quickly as he passed the officer on the highway, the [defendants’] possessing valid San Antonio driver’s licenses, or the bare fact of the car being insured by a third party.”
912 F.2d at 1370-71.
Like the trial court below, we find Tapia very persuasive in the case at bar. At the time the defendant signed the UTTC Trooper Eller did not have sufficient “specific, particularized, and articulable” reasons to suspect that the defendant was engaged in any criminal activity other than speeding. While “there is no constitutional requirement of reasonable suspicion as a prerequisite for seeking consent to search,” State v. Abreu, 257 N.J.Super. 549, 608 A.2d 986, 989 (1992) (citing 3. W. LaPave, Search and Seizure § 8.1 at 32 n. 5.1 (Supp.1992)), it is clear from Trooper Eller’s questions concerning the defendant’s past involvement with drugs that Trooper Eller quickly went beyond merely asking for consent to search to an investigative detention. Contrary to the State’s argument in brief, information obtained by Trooper Eller during this further detention cannot be considered in evaluating whether the trooper had reasonable suspicion to further detain the defendant in the first place, see Arnold v. State, 601 So.2d at 149; Lamar v. State, 578 So.2d at 1385; nor may the defendant’s ultimate refusal to consent to a search of the vehicle be considered for this purpose, see United States v. Skidmore, 894 F.2d 925, 927 (7th Cir.1990) (“a law enforcement officer cannot consider [a defendant’s] refusal to consent as a factor in the official’s determination of reasonable suspicion”). We also decline to accept the State’s suggestion that we consider the defendant to have been detained in a high crime area. Trooper El-ler’s statement that “people haul[ ] drugs up and down the interstate” is far from “evidence” that the interstate is “an area ... known for crime.” State’s brief at 18. As the Utah Supreme Court has observed, “Although the density of the traffic ... varies, travelers use the interstate highway[s] at all times of the day and night and at all times of the year.” State v. Mendoza, 748 P.2d 181, 183-84 (Utah 1987). “It seems unlikely that [drug traffickers] comprise [such] a significant portion of interstate traffic” that we may categorize the interstates as high crime areas. Id. at 183.
We are therefore left with just the four factors enumerated by Trooper Eller at the suppression hearing: (1) the defendant had a temporary license; (2) the car was rented by a third party; (3) the car had a temporary license plate; and (4) the defendant’s nervousness.
The fact that this defendant had a temporary driver’s license is insufficient to supply a reasonable suspicion of criminal activity. Drivers in Alabama receive a temporary license bearing no photograph the first time they obtain a license, each time they renew their license thereafter, and any time it is necessary to replace a license due to loss or theft. At any given time, there are doubtless a large number of persons driving in this state with perfectly valid temporary licenses. And, unless a driver is a college student, serves in the military, or is furnished photographic identification by his or her employer, the driver may well have no form of photo *398 graphic identification other than his or her driver’s license.
We note that at various points in the video taped conversation, Eller asked the defendant for his address, his zip code, his Social Security number, his height, his weight, and his home telephone number. The defendant readily answered each of these questions (as well as the other questions put to him by Eller) and there is absolutely no indication that his answers were at variance with the information contained on his temporary license. Furthermore, the temporary license was valid and the defendant gave a plausible explanation for his possession of a temporary license. While we understand Trooper El-ler’s reluctance to allow the defendant to return to his car to obtain it, we must also note that the defendant stated that he had an employee identification with his photograph on it.
Likewise, the fact that the car had a temporary license plate does not rise to the level of reasonable suspicion. The rental agreement does not give the model year of the car, but that agreement does reveal that the mileage on the car when rented was 2070 miles, which indicates that the car was fairly new. There are, undoubtedly, at any given time, a fair number of recently sold, new cars being operated on Alabama interstates without a permanent license plate. The fact that a car bears a temporary license plate simply does not support the reasonable suspicion that the driver of that automobile is engaged in some type of criminal activity.
The facts that the car had been rented by a third person and that the rental agreement did not list the defendant as an authorized driver might generate the suspicion that the car was stolen, but clearly do not provide suspicion that the defendant was carrying illegal drugs. Indeed, when the trial court asked Eller whether he “ask[ed] everybody [he] stop[ped] out there [at] that hour in the morning in a rental car if [he] c[ould] search them,” Eller responded, “Oh, no, sir.” R. 48-49. Moreover, the defendant provided Trooper Eller with his mother-in-law’s telephone number so that Eller might have allayed any suspicion that the car was stolen. It is clear, however, that Eller detained the defendant to investigate the possibility that he was transporting illegal drugs, not to investigate whether the car driven by the defendant was stolen.
When asked by the prosecutor to describe the defendant’s “nervousness,” Eller responded:
“While asking him the questions about the rental agreement and what he was going to be doing, he would sit in his seat and squirm around and switch positions every few seconds. He remained a constant steady gaze on the car. He wouldn’t look at me and seemed to me like he was just extremely nervous.”
R. 36-37. As previously noted, the video tape visually depicts only the defendant’s car and the activity there, so that we cannot see the defendant during his detention in Eller’s vehicle. We do note, however, that, until Eller asked for permission to search the car, the defendant answered all questions without hesitation and even expansively. There is nothing in the tone of his voice or his manner of speaking to indicate that he was “extremely nervous.”
While there is some authority to the contrary,[4] the majority view appears to be that, unless coupled with additional and objectively suspicious factors, nervousness in the presence of a police officer and/or failure to make eye contact do not establish reasonable suspicion to believe that the person is engaged in criminal activity. See, e.g., United States v. Grant, 920 F.2d 376, 386 (6th Cir.1990) (facts that defendant “displayed nervousness; had shaking hands; and misstated the destination of his flight as New York’s John F. Kennedy Airport, when it was actually going to LaGuardia Airport,” were not sufficient to establish reasonable suspicion to detain defendant even when coupled with other factors consistent with innocence); United States v. Pacheco, 617 F.2d 84, 86-87 (5th Cir.1980) (border agents’ testimony that occupants of a car “ ‘hunkered down’ in the *399 seat of [the defendant’s] ear and avoided eye contact with the agents,” although “relevant,” was “not sufficient, even when combined with other observations to justify the stop”); State v. Darden, 93 Md.App. 373, 612 A.2d 339, 345 (reasonable suspicion not established where defendant “made repeated eye contact” with officers; “appeared nervous and began ‘shaking’ and ‘sweating profusely’ ” when approached by officers; initially stated that he did not have a train ticket, “but then produced one when reminded by the officers that he needed a ticket to ride the train; and when asked his name, misspelled his last name”), cert. denied, 328 Md. 447, 614 A.2d 974 (1992); State v. Lund, 119 N.J. 35, 573 A.2d 1376, 1383 (1990) (“[n]ervousness and furtive gestures may, in conjunction with other objective facts, justify a Terry search[, i.e., a limited protective search for weapons,] but ordinarily ‘[mjere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity’”); State v. Schlosser, 774 P.2d 1132, 1138 (Utah 1989) (where officer stopped vehicle for speeding and observed passenger “turning to the left and to the right, appearing fidgety, bending forward, and turning to look at the officer,” there was no reason to suspect passenger was engaged in criminal activity). Cf. People v. Mason, 213 Ill.App.3d 163, 157 Ill.Dec. 108, 571 N.E.2d 1127, 1129, app. denied, 141 IU.2d 553, 162 Ill.Dec. 501, 580 N.E.2d 127 (1991) (nervousness coupled with report of private citizen that a car she had rented was in the possession of defendants, whom she did not know, and with the facts that defendant driver did not know full name of the person from whom he said he borrowed the car and that one of the passengers attempted to dispose of his jacket established probable cause to arrest defendants for possession of a stolen vehicle). We agree with the Utah Supreme Court that “[w]hen confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited,” State v. Schlosser, 774 P.2d at 1138, and we therefore adopt the majority position on this matter. We also agree with the Fifth Circuit Court of Appeals that “the avoidance of eye contact can have no weight whatsoever- ‘Reasonable suspicion should not turn on ophthal-mological reactions of the [defendant].’ ” United States v. Pacheco, 617 F.2d at 87 (quoting United States v. Lopez, 564 F.2d 710, 712- (5th Cir.1977)), cited with approval in State v. Mendoza, 748 P.2d 181, 184 (Utah 1987).
None of the four factors relied on by the State are inherently suspicious and none of those factors would, standing alone, establish the reasonable suspicion necessary to justify Trooper Eller’s continued detention of the defendant after the defendant signed the UTTC. Even considered together, these factors, which are not significantly different from the factors deemed insufficient in United States v. Tapia, 912 F.2d at 1370-71, are not sufficient to establish reasonable suspicion. A detaining officer “must be able to articulate something more than an ‘inchoate and unparticularized suspicion or “hunch.” ’ [Terry v. Ohio, 392 U.S.] at 27, 88 S.Ct. [at] 1883.” United States v. Sokolow, 490 U.S. at 15, 109 S.Ct. at 1589. In this case, the factors advanced by Trooper Eller amount to no more than a hunch. See State v. Mendoza, 748 P.2d at 183 (factors offered by border patrol officers, including “(1) the apparent ‘Latin descent’ of the occupants of the [car]; (2) the route of travel; (3) the time of day [(about 5:00 a.m.)]; (4) the time of year [ (March) ]; (5) the California license plates; (6) the erratic driving pattern; and (7) the nervous behavior of the occupants,” were not sufficient to stop car on Utah interstate highway for purposes of investigating transportation of illegal aliens). Cf. State v. Bates, 304 Or. 519, 747 P.2d 991 (1987) (where vehicle was stopped for emissions violation at 4:40 a.m. in high crime area, car had out-of-state license plates, defendant had valid out-of-state driver’s license, and there was a television and a video recorder in the back seat, officers did not have reasonable suspicion to believe that defendant posed immediate danger to them and their search of bag under defendant’s seat was improper). Compare People v. Mason, 213 Ill.App.3d 163, 157 Ill.Dec. 108, 571 N.E.2d 1127, 1129, app. denied, 141 Ill.2d 553, 162 Ill.Dec. 501, 580 N.E.2d 127 (1991) (trial court’s determination that officer had probable cause to arrest defendants for possession of stolen vehicle and search car and court’s denial of motion to *400 suppress drugs found in ear were not manifestly erroneous where “a private citizen informed the officers that a car she had rented was in the possession of three men she did not know. She further stated that she had not given them authority to use the car and that her husband did not have the authority to loan the car to anyone. A license check of the car revealed that it was owned by a rental agency. Additionally, the men acted nervous, the defendant [driver] could not give the full name of the man who had loaned them the car, and one of the passengers attempted to dispose of his jacket”).
A trial court’s ruling on a motion to suppress “ ‘is to be given great credence,’ ” Harper v. State, 535 So.2d 599, 601 (Ala.Cr.App.1988), and “will be upheld unless it is clearly erroneous or palpably wrong,” State v. Phillips, 517 So.2d 648, 649 (Ala.Cr.App.1987). The trial court’s decision with regard to the defendant’s motion to suppress was neither clearly erroneous nor palpably wrong. Therefore, the order of the circuit court granting that motion is affirmed.
AFFIRMED.
All Judges concur.

. The actual time alternating with the elapsed time appears continuously at the bottom of the video tape.

. The video tape displays the time in hours: minutes: seconds.

.The defendant stated that a cab struck his car while he was driving without physical possession of his license, having left it in his sweater in his office. As a result, he was required to obtain a new license.

. See Arena v. State, 194 Ga.App. 883, 392 S.E.2d 264, 265-66 (1990) (reasonable suspicion existed for continued detention after traffic stop where defendant "appeared to [officer] to be nervous and 'jumpy' and would not make eye-to-eye contact").