STATE of Utah, Plaintiff and Petitioner,

v.

Jeffrey Vere VINCENT, Defendant and Respondent.

No. 930030.

Supreme Court of Utah.

Oct. 21, 1994.

Jan Graham, Atty. Gen., J. Frederic Voros, Jr., Asst. Atty. Gen., Salt Lake City, for plaintiff.

Joan C. Watt, Vernice S. Ah Ching, Salt Lake City, for defendant.

ZIMMERMAN, Chief Justice:

After an evidentiary hearing, the third district court found that Jeffrey Vere Vincent was not indigent under sections 77–32–1 and 78–56–8 of the Utah Code. It therefore denied Vincent's request for court-appointed counsel and a free transcript on appeal from his theft conviction. The court of appeals reversed, finding that Vincent was indigent. *State v. Vincent,* 845 P.2d 254, 263 (Utah Ct.App.1992). We granted the State's petition for a writ of certiorari to address the court of appeals' approach to indigency determinations. 857 P.2d 948 (Utah 1993). We reverse the court of appeals and reinstate the trial court's ruling.

In July of 1989, the State charged Vincent with one count of theft in violation of section 76–6–404 of the Code. Vincent moved to quash the bindover order, contending that the magistrate had bound him over for trial in violation of *State v. Brickey,* 714 P.2d 644 (Utah 1986).[1] After the trial court denied the motion to quash and the court of appeals refused to hear the matter on interlocutory appeal, Vincent entered a conditional plea of guilty, reserving the right to withdraw that plea should he prevail on appeal. *See State v. Sery,* 758 P.2d 935, 938–39 (Utah Ct.App. 1988); *see also State v. Mabe,* 864 P.2d 890, 892 (Utah 1993).

Vincent then filed a notice of appeal, challenging the trial court's denial of the motion to quash the bindover order. He also filed an affidavit of impecuniosity, asking the trial court to order Salt Lake County to bear the costs of the appeal. The trial court refused to sign an order to that effect. Vincent filed a second affidavit on March 20, 1991. The trial court ordered that affidavit stricken after Vincent failed to appear in court. Vincent filed a third affidavit of impecuniosity, this time with the court of appeals, on July 19, 1991. The court of appeals temporarily remanded the case to the trial court to determine if Vincent was indigent. It also ordered that Vincent's substantive appeal be stayed pending the indigency determination.

The trial court held an indigency hearing in September of 1991. At the hearing, Vincent testified that he had worked for the previous eight months at Minit Lube but had quit shortly before the hearing. During his employment at Minit Lube, Vincent earned approximately $6 per hour and worked between thirty-six and forty hours a week.

Some time prior to the impecuniosity hearing, Vincent moved into an apartment with his ex-wife and their two children. At the time of the hearing, their combined monthly bills consisted of the following: rent, $340; car payment, $50 (against a loan balance of $1100); gas and electric bills, $234; food, $200; and gasoline, $150. They also had been paying $350 to $400 per month for child care during the period when both worked. In addition to the combined bills, Vincent was required to pay $75 per month on his criminal fines. He also owed over $6000 to the Office of Recovery Services for child support which accrued prior to the time he reunited with his family.

Less than one week before the impecuniosity hearing, Vincent voluntarily terminated his employment with Minit Lube. He made no immediate effort to secure other employment. At the time of the hearing, he was caring for his two children, obviating the need for paid child care. His ex-wife's income was the sole source of the family's support. She was earning a net monthly salary of approximately $1000.

The trial court determined that Vincent was not indigent. In making this determination, the court noted that at the time of sentencing, Vincent established that he had a history of stable and regular employment and was, in fact, employed at that time. At the time of the indigency hearing, however, Vincent had quit his job and remained unemployed by choice. Furthermore, the court found that Vincent was being supported by his ex-wife, who worked full-time. Finally,

---

1. In *State v. Brickey,* 714 P.2d 644, 647–48 (Utah 1986), this court held that "due process considerations prohibit a prosecutor from refiling criminal charges earlier dismissed for insufficient evi- dence unless the prosecutor can show that new or previously unavailable evidence has surfaced or that other good cause justifies refiling."

the trial court noted that inconsistencies in Vincent's testimony concerning his work history cast doubt on his credibility. In light of these findings, the court concluded that Vincent had failed to carry the burden of establishing his impecuniosity.

Vincent appealed, and the court of appeals reversed.[2] *Vincent*, 845 P.2d at 263. It held that the trial court had properly imputed income to Vincent and had properly considered the income of Vincent's ex-wife in determining whether Vincent was indigent. *Id.* Nevertheless, the court of appeals held that "even considering these factors, it is apparent that [Vincent] is still 'reasonably unable to bear the costs of the action.'" *Id.* (quoting *Kelsey v. Hanson*, 818 P.2d 590, 592 (Utah Ct.App.1991) (per curiam)).

The court of appeals began with a discussion of the standard of review. Relying on our decision in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), Vincent argued that although the court of appeals should review the trial court's factual findings for clear error, the legal conclusion founded upon those facts—the conclusion as to his indigency or lack thereof—was a legal conclusion to be reviewed for correctness. The court of appeals did not directly address this contention. Instead, it noted that, including the standard advocated by Vincent, there are four recognized standards by which appellate courts review trial court determinations of indigency.[3] *Vincent*, 845 P.2d at 257–58. In the process of surveying the various standards of review, a majority of the panel disregarded an apparent conflict between the standard we stated in *Webster v. Jones*, 587 P.2d 528, 530 (Utah 1978), and the standard adopted by the court of appeals in *Kelsey v. Hanson*, 818 P.2d 590, 591 (Utah Ct.App. 1991). The majority indicated that a detailed analysis of the issue was unnecessary because the trial court's decision must be reversed under any standard. *Vincent*, 845 P.2d at 258.

According to the court of appeals' majority, the trial court had appropriately considered the income of Vincent's ex-wife and had properly imputed to Vincent income from the job that he had quit just prior to the indigency hearing. *Id.* at 260–62. The majority went on, however, to take judicial notice of additional facts and, in light of those facts, concluded that Vincent was indigent. *Id.* at 262–63. This approach deserves further discussion.

The majority examined the evidentiary facts regarding Vincent's living expenses, including "facts" for which Vincent had adduced no record evidence. These judicially noticed facts pertained to the ordinary costs of living for a household with two adults and several children, including costs for medical care, dental care, and clothing. Taking these noticed facts into account, the court of appeals concluded that it "would be unreasonable to assume [Vincent] could afford" to pay counsel and still meet his living expenses. *Id.* Therefore, the court held that Vincent was indigent and ordered that he be provided with court-appointed counsel and a transcript at county expense.[4] *Id.* at 263.

---

2. The court of appeals stayed Vincent's substantive appeal pending resolution of the instant appeal.

3. The four standards surveyed by the court of appeals are as follows: (i) the conclusion of indigency is treated as matter of law reviewable for correctness, but the underlying factual determinations supporting that conclusion are treated as findings of fact reviewable for clear error, *see, e.g., Barry v. Brower*, 864 F.2d 294, 299 (3d Cir.1988); (ii) indigency is treated as a pure fact question reviewable only for clear error, *see, e.g., Webster v. Jones*, 587 P.2d 528, 530 (Utah 1978); (iii) indigency determinations are reviewed under an abuse of discretion standard, *see, e.g., State v. Fiala*, 107 Or.App. 193, 810 P.2d 1344, 1345 (1991); *Kelsey v. Hanson*, 818 P.2d 590, 591 (Utah Ct.App.1991); and (iv) indigency determi-

nations are reviewed under a "heightened" abuse of discretion standard, *see, e.g., Nikander v. District Court*, 711 P.2d 1260, 1262 (Colo.1986).

4. In dissent, Judge Jackson observed that the court of appeals had no choice as to the standard of review. He asserted that because no subsequent decision of this court had called *Webster* into question, the court of appeals was bound by it. *State v. Vincent*, 845 P.2d 254, 263–64 (Utah Ct.App.1992) (Jackson, J., dissenting), *cert. granted*, 857 P.2d 948 (Utah 1993). Therefore, according to Judge Jackson, the sole question is whether the trial court's finding of nonindigence was clearly erroneous. Applying this standard, Judge Jackson concluded that there were insufficient record evidence and insufficient factual findings to reach a conclusion on the indigency question. *Id.* at 266 (Jackson, J., dissenting).

The State sought a writ of certiorari, claiming that the court of appeals erred in two important respects: (i) it failed to apply the proper standard of review; and (ii) it erred by reversing the trial court on the basis of "facts" not in the record. We granted the writ, and the matter is now before us.

We first address the appropriate standard of review for indigency determinations. Although we are puzzled by the court of appeals' failure to even discuss *Webster*, we find the State's reliance on that case a bit misplaced. In *Webster*, this court stated:

> Whether [an accused] is able to employ his own counsel is a question of fact to be determined by the court.... When the court has made such a determination, it is entitled to the same presumptions of correctness as other findings and determinations made by the court and the burden is upon the one attacking it to show that it was in error.

587 P.2d at 530 (footnote omitted). Although the State reads this statement to say that an indigency determination is factual, it is unclear from the opinion whether the court was focusing on the standard of review applicable to the ultimate legal question of whether a given set of facts constitutes a showing of legal indigency, or was instead focusing on the standard for reviewing the factual findings upon which that conclusion is grounded. *Webster*'s discussion of the standard of review, quoted in its entirety above, lacks the depth and precision necessary to permit us to conclude that the court had this distinction in mind, much less that it was addressing it.

It is not surprising that *Webster* is not sufficient to answer the standard-of-review question before us. As we have recently noted, clear enunciation of standards of review has not always been a matter of great import to this court, especially in the area of so-called mixed questions of law and fact. *State v. Thurman*, 846 P.2d 1256, 1268–69 (Utah 1993). Not until the creation of the court of appeals has the need for consistency in standards of review become obvious. *See id.; State v. Pena*, 869 P.2d 932, 935 (Utah 1994). *Webster* is representative of the period before the creation of the court of appeals, when the articulation of standards of review was of less importance because there was only one court to which they were addressed—this one. *See Thurman*, 846 P.2d at 1268.

For the reasons set out above, we do not view *Webster* as an obstacle to the application of the overarching principles articulated in our more recent standard-of-review cases, including *Ramirez, Thurman,* and *Pena.* Despite the State's suggestions to the contrary, these cases are not fundamental departures from earlier standard-of-review law. Rather, they clarify and further define basic positions that have long served as the foundation for standard-of-review law both nationally and within Utah. Therefore, we conclude that the principles articulated in these recent cases are fully applicable here.

■■■ The basic teaching of our recent standard-of-review cases is twofold. Findings of pure fact are uniquely within the province of the trial court and will not be set aside unless clearly erroneous. *Pena*, 869 P.2d at 935–36. On the other hand, the legal effect of those facts, or differently phrased, their normative consequence, is the province of the appellate courts, and no deference need be given a trial court's resolution of such questions of law. *Id.* at 936. Neverthe-

---

In reaching this conclusion, Judge Jackson criticized the majority's reasoning in several respects. First, he contended that it should not have reached out to notice facts not in the record regarding Vincent's living expenses. *Id.* at 263, 265 (Jackson, J., dissenting). Second, he thought that the record was entirely silent as to a number of factors that the court of appeals had previously instructed trial courts to consider. *Id.* at 265 (Jackson, J., dissenting). Included among these factors are the availability of financial assistance from family or friends or from government programs, the defendant's assets, and the defendant's borrowing capacity, all of which are relevant to his ability to pay costs to be incurred in prosecuting the appeal. *See Kelsey*, 818 P.2d at 591–92. Judge Jackson also noted that there was no evidence in the record on the costs of prosecuting the appeal, including the hourly rate or other costs of counsel, an issue upon which the courts "do not allow judges to take judicial notice ... when determining attorney fees." *Vincent*, 845 P.2d at 265 (Jackson, J., dissenting). Judge Jackson would have remanded the matter to the trial court for further proceedings in which the relevant factual questions could have been addressed and a new indigency determination made. *Id.* at 266 (Jackson, J., dissenting).

less, policy considerations may occasionally lead us to define, as a matter of appellate court grace, a legal standard so that it actually grants some operational discretion to the trial courts applying it. *Id.* at 937–39.

■ Applying these principles to the trial court's indigency determination, we hold that the underlying empirical facts regarding the claim of indigency are reviewable for clear error; the conclusion as to whether those facts qualify the defendant as indigent is reviewable for correctness.

Our inquiry, however, does not stop there. Under *Pena*, we must decide what degree of discretion the legal standard for "indigency" bestows on trial courts, i.e., should appellate courts review de novo the conclusion that a given set of facts does or does not constitute legal "indigency," or should some latitude be given trial courts in making that determination, and, if so, how much? *Id.* The answers to these questions depend upon how closely we define the legal concept of "indigency." We think it best to loosely define indigency at the present time, creating, in the terms of the metaphor used in *Pena*, a rather broad pasture for trial judges applying the law of indigency to the facts before them. *Id.* at 937–38.

■ In explaining why we reach this conclusion, it is helpful to refer to those factors identified in *Pena* as pertinent to an appellate court's decision of how completely it should specify the particular historical facts that will satisfy a particular legal standard. First, the greater the complexity and variety of the facts to which the legal standard will be applied, the greater the likelihood that no rule can be spelled out that will adequately address the relevance of all these facts to the legal standard. *Id.* at 939. This teaching cautions against formulating a fact-specific rule of law unless the facts in question are central to the legal policy at stake and sufficiently repetitive as to play a consistent role in the legal analysis. Second, the less experience the appellate court has with particular fact situations to which the legal principle is to be applied, the less likely it is that it can spell out in detail a legal rule that will adequately anticipate the facts that should be outcome determinative if the policy of the legal rule is to be served. *Id.* Third, the more the application of a legal rule depends on facts that the trial judge is uniquely able to evaluate, such as credibility, the less the likelihood that an appellate court can effectively review the application of the law to those facts on a cold record. *Id.* A final, somewhat countervailing factor mentioned in *Pena* is the strength of the policy that the legal rule is designed to vindicate and the need for uniformity in the application of that policy in the trial courts. *Id.*

On balance, these considerations suggest that we should not attempt to define the legal standard for indigency in a very fact-specific manner at this stage. We can describe the legal effect of some facts presented in this case, and we can articulate some overriding principles that should be followed in making indigency determinations. But it would be unwise to go further now.

We note that such an approach is in accord with authorities in this and other states. Indigency is not a concept that has been clearly defined. *See Vincent*, 845 P.2d at 259 ("[C]ourts have had great difficulty in formulating specific standards defining indigency."); *Potter v. State*, 547 A.2d 595, 599 (Del.1988) ("Courts have had great difficulty in setting specific rules defining indigency."); *State v. Lande*, 180 Mont. 157, 589 P.2d 666, 669 (1979) ("[I]t would be impossible for an appellate court to lay down specific and intricate rules defining standards of indigency in each case."). Absent extensive appellate contact with the various fact situations indigency determinations may present and a deepened familiarity with the relevant policy factors, it would be unwise to rush to factual specificity as to what constitutes legal "indigency."

The next matter for consideration is a specification of the facts that we can say with certainty have legal significance in making an indigency determination. This should aid the trial courts in making indigency determinations and the appellate courts in reviewing them. We emphasize, however, that this is not an attempt to spell out an exhaustive checklist of relevant factors.

■ We agree with the general discussion of the criteria for determining indigency

in the decision of the court of appeals now under review. Sections 77–32–1, –2, and –5 of the Utah Code provide that indigent defendants are entitled to appointed counsel and a free transcript if they are unable to employ counsel or pay the cost of a transcript. Nevertheless, the defendants bear the initial burden of establishing their indigency. *See Jordan v. State,* 273 Ark. 75, 616 S.W.2d 480, 482 (1981); *Nikander v. District Court,* 711 P.2d 1260, 1262 (Colo.1986); *Marton v. State,* 809 P.2d 671, 672–73 (Okla.Crim. App.1991). Generally speaking, a person is indigent for purposes of sections 77–32–1 and –2 if payments for counsel or transcripts would place an undue hardship on the defendant's ability to provide the basic necessities of life for the defendant and the defendant's family. *Vincent,* 845 P.2d at 259; *see Potter,* 547 A.2d at 599 ("A defendant is considered indigent when he is unable to retain legal counsel without impairing his financial ability to provide economic necessities of life for himself and his family."); *State v. Masilko,* 226 Neb. 45, 409 N.W.2d 322, 324 (1987) (defining indigence as "inability to retain legal counsel without prejudicing one's financial ability to provide the economic necessi-

ties for one's self or one's family"); *State v. Freeman,* 96 Or.App. 70, 771 P.2d 304, 305 (1989) ("Defendant is entitled to appointed counsel if he would be unable to retain adequate representation without substantial hardship in providing necessities to himself and his family."). This definition is consistent with article I, section 12 of the Utah Constitution and with our decision in *Webster.*

 Determining whether a defendant meets this standard is a fact-intensive inquiry. In deciding the question as an initial matter, trial courts need to take into account a number of factors. In *Kelsey,* the court of appeals discussed the entitlement of a person to waiver of court filing fees. In the course of that opinion, the court addressed generally the factors that should be considered in deciding indigency matters, factors that are equally relevant in the present context. They include:

employment status and earning capacity; [5] financial aid from family or friends; [6] financial assistance from state and federal programs; [the defendant's] necessary living expenses and liabilities; [7] [the defen-

---

**5.** While noting the general rule that inquiry should be limited to an individual's present ability to hire counsel and pay for transcripts, the court of appeals concluded that this was a particularly appropriate case in which to consider a defendant's earning capacity. *Vincent,* 845 P.2d at 260. We agree. At the time of his sentencing, Vincent assured the trial court that he had "a stable and regular employment history." At the indigency hearing, he testified that until the Wednesday before the hearing, he was employed at Minit Lube earning approximately $6 an hour and indicated that he intended to resume work after the hearing. Nevertheless, Vincent asserted during the indigency hearing that having a job is "just not going to help me right now." A fair import of this testimony is that Vincent chose to be employed when it was convenient—at the time of sentencing—and also chose to be unemployed when it was convenient—at the time of filing his affidavit of impecuniosity and at his impecuniosity hearing. In light of this testimony, the trial court could have reasonably concluded that Vincent was attempting to manipulate the justice system.

**6.** We agree with the trial court and the court of appeals that if the facts establish that two people are living together as a domestic unit, without regard to whether they are legally married, then both persons' incomes may properly be considered in determining whether either of them is

indigent. Such a situation would arise when the two people function as a single economic unit. This approach is not without support both in Utah and in other jurisdictions. *See Kelsey,* 818 P.2d at 591 (approving the consideration of "financial aid from family or friends" in indigency determinations); *Hill v. State,* 305 Ark. 193, 805 S.W.2d 651, 653 (1991) (approving consideration of whether defendant "has control or complete discretionary use of funds raised by others for his defense" in indigency determinations); *Nikander,* 711 P.2d at 1262 (holding that indigency determinations must be based on defendant's "complete financial situation" including "income from all sources").

**7.** We note that the mere fact that a defendant's expenses exceed his or her income does not necessarily render the defendant indigent. For example, a person may have an annual income of $100,000 and have annual expenses in excess of $100,000 due to payments for an expensive home, cars, boat, etc. An individual is indigent, however, only when payments for counsel or transcripts would place an undue hardship on the defendant's ability to provide the *basic necessities* of life for the defendant and the defendant's family. *Vincent,* 845 P.2d at 259. Thus, while an income and expense comparison may be helpful in making an indigency determination, it is certainly not determinative.

dant's] unencumbered assets, or any disposition thereof, and borrowing capacity; and, the relative amount of court costs to be waived.

*Id.* at 591–92. We commend this list as a general guide to those who must address indigency issues.

■ Having approved of the criteria utilized by the court of appeals to determine whether Vincent was indigent, we nevertheless reverse the court of appeals and affirm the judgment of the trial court. The problem with the decision under review is that the record before the court of appeals was devoid of certain necessary evidence. For example, Vincent presented no evidence as to the likely cost of counsel or of any transcript that might be needed. Under such circumstances, it is impossible to determine a defendant's ability to pay those expenses. *See People v. Nord,* 790 P.2d 311, 316 (Colo.1990) (holding that defendant has initial burden of establishing right to counsel and transcript at public expense); *Nikander,* 711 P.2d at 1262 (same); *State v. Foster,* 95 Or.App. 452, 769 P.2d 790, 791 (1989) ("The court may deny the request [for court-appointed counsel] if the defendant does not provide sufficient information."); *see also Vincent,* 845 P.2d at 265 (Jackson, J., dissenting) ("The determination of a person's present ability to retain counsel and consequently a person's indigency status should not be made in the vacuum created by assumption, but by looking at the reality, as demonstrated in the record, of retainer fees and other attorney charges.").

The court of appeals' majority attempted to avoid this problem by simply assuming that defendant's assets were insufficient. The majority began by asserting:

If an individual's liabilities exceed his assets to a degree that it would be unreasonable to assume he could afford to pay counsel to represent him on appeal and still meet other living expenses, that individual should, for purposes of exercising his right to appeal, be declared indigent and eligible for appointment of counsel.

*Vincent,* 845 P.2d at 262 (citing *Hill v. State,* 305 Ark. 193, 805 S.W.2d 651, 653 (1991)). The majority recognized that the uncontested numbers before it demonstrated that Vincent had approximately $200 in discretionary income but indicated that "this assumed $200 surplus is essentially illusory." *Id.* It reached this result by assuming that necessary expenses, evidence of which Vincent had not offered, would consume the alleged surplus.[8] *Id.* Accordingly, the majority held that Vincent was indigent and was therefore entitled to counsel and a transcript at the State's expense. *Id.* at 263.

We can find nothing in the record that supports the assumptions of the court of appeals. The record contains only two references to unscheduled "necessary expenses." The following exchange took place during a colloquy between Vincent and his counsel:

Q. Do you have any other medical bills, any other bills that you pay on a monthly basis?

A. No, I got bills, but I don't pay them on a monthly basis.

The only other similar reference in the record is Vincent's exhibit 2, a paycheck stub from Vincent's past employer showing a $4.09 deduction for "MED." This information is simply insufficient to conclude that Vincent's $200 monthly surplus is "illusory," especially in light of Vincent's failure to adduce any evidence of additional expenses.

8. The *Vincent* majority reasoned as follows:

With a total in listed household expenses of $1,649, the four-person family has approximately $200 per month in what the State would have us regard as discretionary income. Nevertheless, this assumed $200 surplus is essentially illusory. Although appellant's affidavit enumerated only those expenses listed above, we note that the computation of expenses includes no allocation for important

necessities such as clothing and medical and dental care. While the family may not incur such expenses on a monthly basis, obviously some part of the supposed $200 excess is allocable to unscheduled necessities such as these. Moreover, at the indigency hearing, appellant acknowledged that he had other unpaid bills, but said that he did not list them because he was not actually paying them on a monthly basis.

*See Foster*, 769 P.2d at 791.[9]

Because Vincent failed to carry his burden and introduce sufficient evidence to prove his indigency and because the court of appeals erred when it made additional factual findings that were not supported by record evidence, we reverse and remand to the court of appeals for further proceedings, including a decision on the merits of the appeal, which that court stayed pending an indigency determination.

STEWART, C.J., and HOWE and DURHAM, JJ., concur.

RUSSON, J., concurs in the result.

*Vincent*, 845 P.2d at 262.

9. Judge Jackson would have remanded for additional findings. *Vincent*, 845 P.2d at 266 (Jackson, J., dissenting). The problem with Judge Jackson's approach is that it fails to distinguish between a failure of proof and inadequate findings. The fault in this case is not in the findings of the trial court, but is instead in Vincent's failure to adduce sufficient evidence to demonstrate his indigency.