**STATE of Utah, Plaintiff
and Respondent,**

v.

**Quetzalcohual CHAPMAN, Defendant
and Petitioner.**

No. 930026.

Supreme Court of Utah.

July 19, 1996.

Jan Graham, Atty. Gen., J. Kevin Murphy, Asst. Atty. Gen., Salt Lake City, for plaintiff.

Brook C. Wells, Joan C. Watt, Salt Lake City, for defendant.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

DURHAM, Justice:

This case is before the court on a petition for a writ of certiorari. Defendant Quetzalcohual Chapman was arrested after violating a Salt Lake County loitering ordinance. He was subsequently charged with one count of burglary and two counts of theft, all second degree felonies. The Third District Court denied his pretrial motion to suppress evidence gathered at the time of his arrest. He filed an interlocutory appeal, and the court of appeals affirmed. *State v. Chapman*, 841 P.2d 725, 729 (Utah Ct.App.1992). We granted Chapman's petition for certiorari. *State v. Chapman*, 857 P.2d 948 (Utah 1993). We affirm in part and reverse in part, holding that the officers properly detained Chapman but improperly exceeded the scope of their initial detention of him when they ran a stolen weapons check on the gun in his possession.

## FACTS

Around 10:00 p.m. on January 25, 1991, Officer Todd Rasmussen, a police officer employed by the Granite School District, no-ticed a Jeep Wagoneer with two individuals in the back seat parked in Central High School's parking lot. Rasmussen pulled behind the car and turned on his warning lights. After identifying himself, Rasmussen approached the car. He asked its occupants, Chapman and a young woman, what they were doing, to which they responded "just talking and stuff." He then requested identification from each of them. The woman, who owned the car, produced a driver's license and a vehicle registration. Chapman did not have any identification but spelled out his name for Rasmussen. Rasmussen asked Chapman and his companion to remain in the car. He returned to his patrol car and ran driver's license and warrants checks on Chapman. A second officer, Craig Ellertson, heard Chapman's name over his radio and promptly contacted Rasmussen. Ellertson warned Rasmussen to be careful because Chapman was an alleged gang member and was known to carry a gun. Ellertson had received this second-hand information roughly three weeks earlier. Ellertson then drove to the high school to join Rasmussen. Upon his arrival, both officers approached the car, asked Chapman to step out, and told him to place his hands on his head and lean forward against the car. They told Chapman about the information concerning his alleged gang membership and likely gun possession. They then conducted a pat-down search and found no weapon. When asked if he was armed, Chapman replied that he was not carrying a gun, but at some point he conceded that he did have a gun in a small pack under the front seat of the car. The warrants check ultimately came back negative.[1]

The officers requested permission from Chapman's companion to search her vehicle. They obtained consent and searched the car. While doing so, they found a small "fanny-pack" under the front seat and, upon looking inside, discovered a nine-millimeter pistol. The gun's clip contained bullets, but no bullet was in the firing chamber and its presence in the vehicle in that condition was lawful. *See* Utah Code Ann. §§ 76–10–502, –504. At

---

1. It is unclear from the record exactly when Officer Rasmussen received the response to the warrants check. However, from the testimony of all parties, it can be pieced together that it came back *after* Rasmussen had received the report from Officer Ellertson that Chapman was an alleged gang member and some time during the search of either Chapman or the vehicle.

some point shortly after discovering the gun, the officers ran an NCIC stolen weapons check against the gun. Also at or about this time, Rasmussen handcuffed Chapman and gave him a *Miranda* warning.[2] Chapman agreed to talk to Rasmussen. Rasmussen questioned him about the gun. The computer check revealed that it had been stolen in a residential burglary. During this questioning, Chapman confessed to the burglary. The officers went to Chapman's apartment, searched it, and found nothing. They then went to the Granite School District police office and continued to question him. The officers eventually took Chapman to the police station, where he was booked into jail.

Officer Rasmussen's initial decision to approach the car was based on his belief that its occupants, Chapman and his companion, were on school property "without lawful business," in violation of the following ordinance:

It is unlawful for any person to loiter, idle, wander, stroll or play in, about, or on any school, college or university grounds, or building, either on foot or in or on any vehicle, without having some lawful business therein or thereabout, or in connection with such school, college or university, or the employees thereof.

Salt Lake County Ordinance ch. 10.32.010(C). Rasmussen testified that when he encounters people on school grounds without lawful business, he generally asks them for identification, checks for outstanding warrants and, if there are no warrants, asks them to leave.[3] He occasionally issues citations for violating the ordinance. Rasmussen testified that he is not sure why he arrested Chapman but to the best of his recollection believes that it

was because Chapman had violated the ordinance. Chapman's companion was neither arrested nor issued a citation.

Chapman was charged with one count of burglary and two counts of theft, all second degree felonies. He filed a pretrial motion to suppress the evidence gathered after his initial detention. The trial court denied the motion following an evidentiary hearing. Chapman filed an interlocutory appeal, and the court of appeals affirmed. *State v. Chapman*, 841 P.2d 725, 728 (Utah Ct.App.1992). A majority of the panel held that the trial court's finding of reasonable suspicion was not clearly erroneous. *Id.* at 727–28. It also found that the officers had probable cause to arrest Chapman, given his presence on school property "without having some lawful business." *Id.* at 728. Because the court felt Rasmussen had probable cause to arrest Chapman the moment Rasmussen saw him, it found that Rasmussen could search Chapman incident to that arrest, even though the search occurred prior to the arrest. *Id.* at 728 n. 4.[4] Judge Orme dissented. He argued that the search and related interrogation exceeded the scope of appropriate detention, given the reason for the initial stop. *Id.* at 729 (Orme, J., dissenting). We granted Chapman's petition for certiorari. *State v. Chapman*, 857 P.2d 948 (Utah 1993).

Chapman raises the following issues on certiorari: (i) whether the officers lacked reasonable suspicion to justify his detention; (ii) if the officers did have reasonable suspicion, whether they exceeded the permissible scope of detention given the reason for the initial stop; and (iii) whether the officers had probable cause to arrest him. The State maintains that the officers had reasonable

---

2. All parties gave inconsistent testimony on this point. Officer Rasmussen testified that he did not handcuff Chapman and place him in his patrol car until after they found the gun. Officer Ellertson, however, testified that Chapman had already been handcuffed and was seated in Rasmussen's patrol car when they found the gun. Meanwhile, Chapman's companion testified that she saw Chapman outside of the police car but apparently handcuffed when the gun was discovered.

3. Rasmussen testified that he often encounters individuals "necking," and although he generally approaches the car to ensure the conduct is consensual, he rarely issues citations in these

situations. If he suspects that the conduct is not consensual, he asks one of the parties to accompany him to his patrol car so that he can question them separately. Rasmussen did not separate Chapman and his companion, and he testified that he had no reason to suspect any nonconsensual conduct.

4. The court of appeals did not reach the constitutionality of the loitering ordinance. The majority found that the officers could reasonably rely on the ordinance because it had not yet been declared unconstitutional. *Chapman*, 841 P.2d at 727.

suspicion to detain Chapman, that they did not exceed the permissible scope of that detention, and that they had probable cause to arrest. The State also argues that even if the officers' conduct was improper, that conduct was sufficiently attenuated from the discovery of the inculpatory evidence to render the evidence admissible.[5]

## ANALYSIS

### I. STANDARD OF REVIEW

■ Before addressing the merits of Chapman's arguments, we must resolve a preliminary question concerning the appropriate standard of review for reasonable suspicion determinations. The court of appeals characterized the reasonable suspicion determination as a question of fact and therefore applied the clearly erroneous standard of review. *Chapman*, 841 P.2d at 727. As our decision in *State v. Pena*, 869 P.2d 932 (Utah 1994), makes clear, that standard is incorrect. According to *Pena*, whether a particular set of facts gives rise to reasonable suspicion is a question of law, which is reviewed for correctness. *Id.* at 939. The legal standard for reasonable suspicion, however, "is highly fact dependent and the fact patterns are quite variable." *Id.* at 940. The legal standard therefore conveys a measure of discretion to the trial court in our application of the correctness standard to a given set of facts. *Id.* at 939.[6]

### II. SEARCH AND SEIZURE

■ We begin by analyzing whether the officers violated Chapman's rights under the Fourth and Fourteenth Amendments to the United States Constitution by initially detaining him for search and interrogation.[7] The State concedes that Chapman was seized within the meaning of the Fourth Amendment when Officer Rasmussen pulled behind the parked vehicle and activated his warning lights. *See Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395-96, 59 L.Ed.2d 660 (1979); *State v. Lopez*, 873 P.2d 1127, 1131 (Utah 1994). "However, 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Lopez*, 873 P.2d at 1131 (quoting *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968)). To determine whether a search or a seizure is constitutionally reasonable, we must first determine whether the officer's action was "'justified at its inception.'" *Id.* at 1132 (quoting *Terry*, 392 U.S. at 19-20), 88 S.Ct. at 1878-79). If so, we then consider whether the resulting detention was "'reasonably related in scope to the circumstances that justified the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 19-20, 88 S.Ct. at 1878-79); *see also State v. Ramirez*, 817 P.2d 774, 785 (Utah 1991).

■ With respect to the first facet of this analysis, it is settled that a police officer may detain and question an individual "'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *Pena*, 869 P.2d at 940 (quoting *United States v. Place*, 462 U.S. 696, 702-03, 103 S.Ct. 2637, 2641-42, 77 L.Ed.2d 110 (1983)); *accord United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581,

---

5. The State has also requested that we dismiss certiorari as improvidently granted. According to the State, this case fails to present a special and important legal question and should therefore not be reviewed on certiorari. Having already denied the State's "Motion to Dismiss Certiorari Proceeding," we do not address the State's renewed request.

6. The State argues that at the time the court of appeals decided this case, "clearly erroneous" was the appropriate standard for reviewing reasonable suspicion determinations. The State relies on *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987), in which we reviewed a reasonable suspicion determination under the clearly erroneous standard of review. According to the State, *Pena*

represents a "clear break" from prior precedent and therefore should apply prospectively only. The State's argument is without merit. *Pena* did not overrule *Mendoza* or any other precedent but merely fine-tuned the "correctness" standard articulated in *State v. Ramirez*, 817 P.2d 774, 781-82 (Utah 1991). In fact, *Pena* expressly distinguished *Mendoza*. *Pena*, 869 P.2d at 935 & n. 3; *see also State v. Vincent*, 883 P.2d 278, 281-82 (Utah 1994).

7. Chapman has not cited or relied on article I, section 14 of the Utah Constitution, and therefore, we confine our analysis to the protections guaranteed Chapman under the United States Constitution.

1585, 104 L.Ed.2d 1 (1989); *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–80; *Ramirez*, 817 P.2d at 786; Utah Code Ann. § 77-7-15. Both the district court and the court of appeals found that the officers had reasonable articulable suspicion to believe Chapman was violating the loitering ordinance. Chapman challenges this determination on two grounds. First, he claims that the officers did not have reasonable suspicion to believe Chapman was on school property "without a lawful purpose," in violation of the loitering ordinance. Second, he argues that even if the officers had reasonable suspicion to believe he violated the loitering ordinance, that ordinance is facially unconstitutional and therefore cannot be used to justify his detention.

■ As indicated above, reasonable suspicion requires an objectively reasonable belief that an individual is engaged or is about to be engaged in criminal activity. The alleged criminal activity in this case is the violation of an ordinance that prohibits loitering "in, about or on any school ... grounds, ... either on foot or in or on any vehicle, without having some lawful business therein or thereabout." Salt Lake County Ordinance ch. 10.32.010(C). The officer in this case articulated a number of facts which, when viewed objectively and in light of the broad language of the loitering ordinance, constitute reasonable suspicion as a matter of law. The lateness and darkness of the hour and the location of both occupants of the vehicle in the back seat, together with the fact that the school grounds were otherwise empty, could lead a reasonable officer to conclude that the two individuals were on the property without lawful business. *See Chapman*, 841 P.2d at

728 ("The trial court's findings of fact show that a reasonable person would conclude Chapman had violated the ordinance."); *id.* at 729 (Orme, J., dissenting) ("I agree with the majority that the police officer possessed reasonable suspicion to initiate a stop."). Moreover, Officer Rasmussen testified that on at least one occasion, he had encountered a rape in progress under very similar circumstances.[8] Given these facts and the latitude the trial court has in making the determination that a given set of facts constitutes reasonable suspicion as a matter of law, *see Pena*, 869 P.2d at 939–40, we hold that the trial court did not err in concluding that Officer Rasmussen had reasonable suspicion to believe that Chapman was violating the ordinance, and was justified in initially detaining him. The court of appeals properly affirmed the trial court on this point.

## III. RELIANCE ON THE ORDINANCE

■ Chapman argues that the statute relied upon by the officers to detain him was unconstitutional[9] and that the unconstitutionality of the ordinance should have been obvious to the officers and therefore they could not properly rely on it to detain him. In *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), the Supreme Court upheld an arrest made in good faith pursuant to a stop and identify statute that was later declared unconstitutional. *Id.* at 37–38, 99 S.Ct. at 2631–32. Chapman relies on the following language from *DeFillippo*:

Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers con-

---

8. It is important to note that the possibility of rape does not justify the continued detention of Chapman and his companion. If this was indeed the sole basis for detaining Chapman, the detention should have ended as soon as the officer ruled out the possibility of rape. In this case, that occurred almost immediately. The officer testified that if he suspects nonconsensual conduct, he generally asks one of the parties to join him in his car. He did not do so in this case. Moreover, the officer admitted that he had no reason to believe defendant's companion was in danger of being raped. Having ruled out the possibility of rape, the officer would have been required to release Chapman, in the absence of

any other justification, or immediately issue a citation for violating the county ordinance.

9. Because we hold that the officers were entitled to rely upon the ordinance to detain Chapman and because Chapman was never charged with violation of the ordinance, we do not reach Chapman's direct challenge to the constitutionality of the ordinance itself. (The author of this opinion is of the view that the circumstances of this case would justify reaching the constitutionality of the ordinance. However, a majority of the court did not agree.)

cerning its constitutionality—*with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.*

*Id.* at 38, 99 S.Ct. at 2632 (emphasis added). The court of appeals, in fact, did not reach the issue of constitutionality of the county ordinance because it found:

Even if this court were to determine the ordinance unconstitutional, Chapman's stop and subsequent arrest under the ordinance would still be valid. A stop or arrest made pursuant to an officer's good faith reliance on an ordinance not yet declared unconstitutional is valid, regardless of a subsequent judicial determination of its unconstitutionality.

*Chapman,* 841 P.2d at 727 (citing *Illinois v. Krull,* 480 U.S. 340, 349–50, 107 S.Ct. 1160, 1166–67, 94 L.Ed.2d 364 (1987); *DeFillippo,* 443 U.S. at 37–38, 99 S.Ct. at 2631–32; *United States v. Landry,* 903 F.2d 334, 339 (5th Cir.1990)). We agree with the court of appeals that the officers were entitled to rely on the county ordinance in making the initial stop of Chapman and his companion. We note that no evidence exists in the record to indicate that the officers acted in bad faith in determining that Chapman and his companion were violating the ordinance.

## IV. SCOPE OF DETENTION

Having concluded that the officers' actions were justified at their inception, we now examine whether the detention in this case was reasonably related in length and scope to the circumstances that rendered its initiation permissible. In *State v. Lopez,* 873 P.2d 1127 (Utah 1994), we reemphasized that once a stop is made, the detention " 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' " *Id.* at 1132 (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983)); *see also State v. Johnson,* 805 P.2d 761, 763 (Utah 1991); *State v. Deitman,* 739 P.2d 616, 617 (Utah 1987) (per curiam). " '[A]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, conduct a computer check, and issue a citation. However, once the driver has produced a valid driver's li-

cense and evidence of entitlement to use the vehicle, "he must be allowed to proceed on his way, without being subjected to further delay by police for additional questioning." ' " *Lopez,* 873 P.2d at 1132 (quoting *State v. Robinson,* 797 P.2d 431, 435 (Utah Ct.App. 1990) (quoting *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988))). While the present case is not a "routine traffic stop," these same principles apply.

Chapman claims that the officers impermissibly expanded the scope of his detention when they ran driver's license and warrants checks. He argues that the scope of detention was strictly limited to ascertaining whether he was engaged in lawful business on the premises. Once that was determined, the officers could either arrest Chapman, issue a citation, or release him. The State, on the other hand, contends that Fourth Amendment law generally permits warrants checks and that waiting five minutes for such a check is a negligible personal intrusion.

In *Lopez,* we considered the issue of whether running a warrants check incident to a traffic stop exceeded the scope of detention. We ultimately held that running a warrants check did not exceed the scope of detention "so long as it does not significantly extend the period of detention beyond that reasonably necessary to request a driver's license and valid registration and to issue a citation." *Lopez,* 873 P.2d at 1133. As Professor LaFave explains:

[T]here are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation ..., but the officer may also or instead conduct a non-search examination of the suspect's person, car, or objects he is carrying.... Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification *or determine whether a person of that identity is otherwise wanted.* ... There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however,

if their use makes the period of detention unduly long.

3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 9.2(f), at 375–80 (1987) (footnotes omitted).

Chapman relies on *State v. Johnson*, 805 P.2d 761 (Utah 1991), for his argument that the officers were not allowed to expand the scope of detention by running a warrants check against him. Chapman's reliance is misplaced. In *Johnson*, we held that running a warrants check on a *passenger* in an automobile that had been properly stopped exceeded the appropriate scope of detention. *Id.* at 764. We did not hold, however, that running a warrants check on the driver, who had properly been stopped, would have exceeded the scope of detention. As set forth above, Chapman was properly detained at that point, and the officers therefore were entitled to run the warrants check.

This alone, however, does not resolve the question of whether the officers exceeded the appropriate scope of detention. It is unclear from the record exactly when the officers received a negative response to the warrants check. Upon receiving that response, the officers were required to either arrest Chapman, issue him a citation, or release him. If Chapman had already been arrested at the time the response came back, his detention was proper. If, on the other hand, he was detained for additional questioning after the negative response to the warrants check, the officers may have exceeded the appropriate scope of detention. Continued detention would be justified only if the officers had a reason, independent of the loitering ordinance, to do so.

Three possible reasons have been advanced by the State to explain why the officers properly continued the initial detention of Chapman: (i) The officers had reasonable suspicion to believe Chapman had committed, or was about to commit, another offense; (ii) the search and related questioning was an appropriate *Terry* frisk; and (iii) the search and related questioning were appropriate as a "weapons search."

■■■■ The State claims that the second-hand information concerning gang member-

ship and possession of a gun supported reasonable suspicion and therefore justified Chapman's continued detention. The State admits that gang affiliation, by itself, is no basis for an investigative detention. When coupled with information about possible possession of a gun, however, the State maintains that these facts constitute reasonable suspicion notwithstanding the information's hearsay nature. We disagree. After receiving the report that Chapman was known to carry a weapon, the officer was certainly entitled to follow ordinary safety procedures to protect himself. This may have included waiting for a back-up officer to arrive, asking Chapman to step out of the vehicle, and even questioning him about being armed. Once Chapman was outside of the vehicle and known to be unarmed, however, the officers had no reasonable, articulable suspicion either to continue questioning him regarding weapons or to search for them. However, because the record is unclear as to when Chapman disclosed that he had a weapon in the vehicle, both the "weapons search" and the "*Terry* frisk" arguments must be examined.

■■■■ Officer Rasmussen testified that Chapman said he had a gun inside the vehicle when he was initially questioned about being armed. Assuming that this is accurate, the officers were justified in searching for the weapon to insure that the weapon was not being carried illegally (i.e., loaded). *See* Utah Code Ann. § 76–10–502 (1994). However, once that determination was made, the officers had no reasonable, articulable suspicion to justify running a check on the weapon to see if the weapon had been stolen. By the officers' own testimony, no independent facts surrounding the encounter with Chapman created suspicion that he was involved in any illegal activity beyond violating the loitering ordinance. Therefore, the officers impermissibly expanded the scope of Chapman's detention when they ran the additional check on the gun to determine its ownership.

■■■■ This does not mean that officers are prohibited from running such weapons checks in appropriate circumstances. If the surrounding facts give rise to a reasonable, articulable suspicion that a gun is stolen,

such a check is appropriate. Here, the officers themselves testified that no such circumstances existed; therefore, their actions were not permissible.

If we assume, for purposes of analysis, that the testimony of Chapman's companion is true, that Chapman indicated he had no weapon when originally questioned by the officers but admitted to possessing a gun in the vehicle only after continued questioning, then even the officers' additional interrogation of Chapman would have been beyond the scope of his detention for violation of the loitering ordinance.

■ Applied to the State's next contention, the search cannot be considered a *Terry* frisk, which requires reasonable, articulable suspicion that the suspect is armed and presently dangerous. *Terry*, 392 U.S. at 21, 23, 88 S.Ct. at 1879–80, 1881–82. The officer admitted that on the basis of his own observations, he had no reason to believe Chapman was presently armed and dangerous. Therefore, the State has failed to demonstrate that the officers were justified in continuing their detention of Chapman under *Terry*.

■ Finally, as indicated above, unless Chapman gave immediate indication that there was a weapon in the vehicle, the ensuing search cannot be justified as a "weapons search." As Judge Orme stated, "Nothing

about the nature of the underlying offense being investigated prompted a concern for safety ... [and] [n]othing defendant did, by way of conduct, attitude, or gesture, suggested the presence of a weapon in the vehicle." *Chapman*, 841 P.2d at 732 (Orme, J., dissenting). Therefore, the officers were entitled to prolong the detention of Chapman to search for weapons only if Chapman immediately indicated that he possessed a weapon. Moreover, if we assume that the officers were so informed, they were entitled to search only so long as was necessary to insure the safety of Chapman's companion and themselves. If we further assume that the stolen weapon was found during the above-described search, the officers were entitled to expand the detention of Chapman only long enough to determine that the weapon was legally stored and transported.[10] Unless other factors independently suggested to the officers that the weapon was stolen, such a search would not permit the officers to continue to expand Chapman's detention to run an NCIC check. Therefore, the State cannot justify the officers' actions as a necessary "weapons search." We agree with Judge Orme that the officers impermissibly expanded the scope of their initial detention of Chapman and therefore the gun should be excluded from evidence. *Chapman*, 841 P.2d at 732 (Orme, J., dissenting).

---

10. Under section 76–10–504(1), it is a misdemeanor to carry a "concealed dangerous weapon," loaded or unloaded. There is an exception in paragraph (2) of that section, however, providing, "Nothing in this Part ... shall prevent any person ... from keeping within his place of residence, place of business, or any vehicle under his control any firearm, except that it shall be a class B misdemeanor to carry a *loaded* firearm in a vehicle." (Emphasis added.)

Officer Rasmussen, the arresting officer, testified that the weapon in this case was *not loaded* and therefore qualified for the exemption contained in section 76–10–504(2). The State has cited section 76–10–505.5 and section 53A–3–502 to suggest that having the weapon in a vehicle on school property was nonetheless unlawful. However, section 76–10–505.5 specifically says that it does not apply to "persons authorized to possess a firearm as provided under Section ... 76–10–504(2)," the provision permitting unloaded weapons in vehicles. Section 53A–3–502 does not cross-reference the exemption in section 76–10–505.5(2) because it was passed in 1988,

whereas section 76–10–505.5 was enacted in 1993. Section 53A–3–502 does, however, contain its own exemption for weapons on school property "present or to be used in connection with a lawful, approved activity."

It is clear that section 76–10–504(2)'s exception was explicitly intended by the legislature to override section 76–10–505.5's prohibition of unloaded weapons on school property and would therefore qualify exempted acts as "lawful, approved activit[ies]" under section 53A–3–502. In any event, the more recent statute is a clear indication of legislative intent, however misguided the policy might seem to us or to law enforcement personnel.

Hence our conclusion that defendant's possession of this weapon in a vehicle was lawful and our determination that *State v. Williams*, 636 P.2d 1092 (Utah 1981), relied on by the State, does not apply. In *Williams*, the firearm (in a satchel in a vehicle) was "loaded, in a fully cocked position." *Id.* at 1093. A *loaded* weapon does not qualify for the vehicle exception in section 76–10–504(2).

## V. PROBABLE CAUSE

Chapman's final claim is that the officers did not have probable cause to arrest him for violating the loitering ordinance. Chapman, however, did not raise this issue in his petition for certiorari. In his petition, he argued that the officers could not rely on a blatantly unconstitutional loitering ordinance to establish probable cause to arrest. In his brief on the merits, Chapman makes only passing mention of this argument. However, as mentioned above in section III, he has failed to demonstrate that the officers acted in bad faith or that the ordinance is "flagrantly unconstitutional." *See DeFillippo,* 443 U.S. at 38, 99 S.Ct. at 2632. His primary claim is that the officers did not have probable cause to believe he was on the property without a lawful purpose. This issue is not properly before the court. "In granting a petition for certiorari, we review '[o]nly the questions set forth in the petition or fairly included therein' and for which certiorari is granted." *DeBry v. Noble,* 889 P.2d 428, 443 (Utah 1995) (quoting Utah R.App.P. 49(a)(4)); *see also Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994); *Butterfield v. Okubo,* 831 P.2d 97, 101 n. 1 (Utah 1992).

The State's final claim is similarly flawed. The State argues that even if the officers improperly detained Chapman, that illegal act was sufficiently attenuated from his inculpatory statements to render those statements admissible. This issue was not considered by the trial court or by the court of appeals. The parties did not mention it in the petition for certiorari or the response thereto. Given the lack of factual findings, combined with the failure to raise this issue below, it would be inappropriate to consider this issue for the first time on certiorari.

## CONCLUSION

In conclusion, we hold that the officers were within the proper scope of their duties when they initially detained Chapman and his companion. We also find proper the officers' decision to run a warrants check on the individuals detained for violating that ordinance. Because we accept that Chapman voluntarily informed the officers that he did possess a weapon, we also find that the officers were allowed to conduct a brief patdown search of Chapman to ensure their safety and that of Chapman's companion. Because Chapman's companion consented to a search of her vehicle, the search that produced Chapman's weapon is also acceptable. The officers may also have had independent grounds to search for the weapon, after Chapman indicated he was carrying a gun in the vehicle, to insure that the gun was properly stored and being legally carried. However, we find that the officers impermissibly expanded the scope of their detention of Chapman when they additionally ran an NCIC check on the serial number of the gun Chapman carried. Nothing indicated that the weapon was stolen, and the weapon was, under current Utah law, legally carried in the vehicle notwithstanding the fact it was concealed and contained ammunition in the clip. Therefore, the evidence gathered as a result of the improper search was illegally obtained. The decision of the court of appeals in *State v. Chapman,* 841 P.2d 725 (1992), is reversed.

ZIMMERMAN, C.J., and STEWART, Associate C.J., concur in Justice DURHAM's opinion.

HOWE, Justice, dissenting:

I dissent. The majority holds that the officers acted properly when they detained Chapman and his companion to run a warrants check on them, conduct a brief patdown search of Chapman, and search the automobile for a weapon. The majority holds, however, that once the weapon was found, "the officers impermissibly expanded the scope of their detention of Chapman when they additionally ran an NCIC check on the serial number of the gun Chapman carried." I disagree. The trial court's findings of fact, well supported by the record, clarify that the officers placed Chapman under arrest for violation of the loitering ordinance *before* running the stolen weapons check. That being so, there is no question as to the legality of his further detention while the check was conducted.

The trial court's chronological findings of facts are as follows:

8. Officer Rasmussen had probable cause to believe that the defendant had committed a public offense of "Unlawful Acts About Schools" *when he arrested the defendant.*

9. Officer Rasmussen also had legitimate safety concerns which justified physical detention of the defendant, when he found an automatic pistol, a loaded clip[,] and several other rounds of ammunition inside the vehicle, within a few feet of the defendant.

10. An NCIC records check provided information that the gun was reported stolen and *justified the officer to also arrest defendant for possession of a stolen gun.*

(Emphasis added.) Thus, the trial court found that when Officer Rasmussen arrested Chapman, he did so properly under the loitering ordinance. When the officer later determined the gun to be stolen, that served as additional grounds for the arrest.

This interpretation of the court's findings is supported by the record. At the suppression hearing, Officer Ellertson, the back-up officer, and Megan Borg, Chapman's companion, both testified that Chapman had already been handcuffed (and presumably arrested) before the gun was found. Although Officer Rasmussen, the arresting officer, initially testified that he handcuffed Chapman after the stolen weapons check, he later clarified that, to "the best of [his] recollection," he arrested Chapman for violation of the loitering ordinance right after the weapon was found. When asked what the gun had to do with the loitering ordinance, Rasmussen said he felt he needed to investigate the gun further. This need for additional investigation implies that the officer had not yet conducted the stolen weapons check. Later, Rasmussen stated that he had placed Chapman under arrest even though the search of the car had not turned up "any other information of illegal activity." Clearly the officer had not yet conducted the weapons check. Thus, the two officers and Chapman's companion all testified that Chapman had been placed under arrest for violation of the loitering ordinance before the officers conducted

the stolen weapons check. This version of the facts is consistent with footnote two of the majority opinion.

The court of appeals' chronological recitation of the facts also supports this conclusion:

The officers asked permission to search the vehicle for the weapon. The owner of the car consented to the search. When the officers located the fanny pack, they held it up and Chapman nodded. The officers opened the fanny pack and removed a weapon. . . .

Chapman was then arrested, handcuffed, and given his *Miranda* warnings. Officer Rasmussen testified that he arrested Chapman for violation of the trespass ordinance. The officers ran a computer check on the weapon and received notice that it had been stolen.

*State v. Chapman,* 841 P.2d 725, 726 (Utah Ct.App.1992).

Because Chapman had already been placed under arrest before the officers ran the weapons check, the officers' further detention of Chapman was permissible. I would affirm the court of appeals.

RUSSON, J., concurs in the dissenting opinion of HOWE, J.